767 A.2d 1008 (2001)
Matthew J. SCHWARTZ, Plaintiff-Appellant,
v.
Darryl JORDAN, and Public Service Electric & Gas, Defendants, and
Plainsboro Township, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2001.
Decided March 5, 2001.
Albert M. Stark, Lawrenceville, argued the cause for appellant (Stark & Stark, attorneys; Mr. Stark, of counsel; Jason G. Steinhart, on the brief).
Steven F. Satz, North Brunswick, argued the cause for respondent (Busch and Busch, attorneys; Mr. Satz, of counsel and on the brief).
Before Judges SKILLMAN, CONLEY and WECKER.
The opinion of the court was delivered by CONLEY, J.A.D.
Following a three-day liability trial, the jury concluded that, although Plainsboro Township[1] had created a dangerous condition of which it had notice and which was a proximate cause of plaintiff's personal injury, the Township's action and/or inaction with respect to remedying the condition was not palpably unreasonable. On appeal plaintiff raises several contentions, only *1009 one of which we need address as our consideration as to that issue leads us to conclude a reversal and new trial is required. That issue concerns the trial judge's exclusion of evidence of the motivating force behind the Township's remedial efforts, that is, prior accidents in the general vicinity of plaintiff's accident, which had caused serious injury and death. We are convinced under the particular circumstances that the evidence was highly relevant to the only real issue in contention, whether the Township was palpably unreasonable in its efforts to remedy the dangerous condition which the jury concluded was a proximate cause of plaintiff's injury. We are further convinced the exclusion of this evidence cannot be considered harmless error.
Here are the facts. At approximately 6:19 p.m. on January 3, 1997, plaintiff, who has cerebral palsy and uses crutches to assist him in walking, entered the north side of a crosswalk on Plainsboro Road, near the entrance to Morris Davidson Park. The crosswalk is not located at a signaled intersection, but is located between the Hunters Glen Drive/Deer Creek Drive intersection and the T-intersection at which Thoreau Drive intersects with Plainsboro Road across from Morris Davidson Park. The crosswalk, close to the corner of Thoreau Drive, crosses the four lanes of Plainsboro Road, which runs east and west. As plaintiff entered the crosswalk, he began crossing the westbound lanes of Plainsboro Road. Defendant Jordan, traveling in the left lane of the westbound traffic at approximately forty miles per hour, struck him.
At the time of the accident, the crosswalk was painted with two lines and "hash marks going across." There was no controlling traffic light at this crosswalk, although one was located 1280 feet east of the crosswalk at the intersection of Tamarron Drive/George Davidson Drive. The speed limit on Plainsboro Road was forty-five miles per hour. Posted signs warned both westbound and eastbound motorists that they were approaching a crosswalk. At the crosswalk itself, signs informed both westbound and eastbound motorists of the State law requiring them to "yield to pedestrians in a crosswalk."
Although plaintiff urged a number of actions that could have been taken to improve the safety of the crosswalk prior to his accident, the lighting, or lack thereof, was the primary focus. In that respect, it is undisputed that at the time of the accident the lighting was poor. Indeed, while there was a street lamp on the south side of the crosswalk illuminating the eastbound lanes, there was none on the side from which plaintiff entered. Moreover, there were no street lamps on that side of Plainsboro Road from the corner of Hunters Glen Drive/Deer Creek Drive east to the corner of Tamarron Drive/George Davidson Drive, a distance that encompassed the park.
Thus, the accident report stated "intersection is lit by a street lamp, but it would not be considered a well illuminated area." The driver, defendant Jordan, never saw plaintiff until impact and an independent witness to the accident stated that all he "noticed was a silhouette of something.... It was very dark."
Plaintiff's claim against the Township, of course, is governed by the Tort Claims Act, in particular N.J.S.A. 59:4-2, which provides:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or *1010 b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
See generally, Wymbs ex rel. Wymbs v. Township of Wayne, 163 N.J. 523, 531-32, 750 A.2d 751 (2000); Garrison v. Township of Middletown, 154 N.J. 282, 286, 712 A.2d 1101 (1998).
The evidence here was overwhelming that the crosswalk was a dangerous condition and that danger was a contributing factor to the accident. It is also undisputed that the Township had long been aware of the danger at this crosswalk and the general area, which it had for over a year before the accident made various efforts to remedy. It is those efforts which were the focus of the dispute during the trial, not in terms of what the Township had actually done, but in terms of whether what had been done up to the date of the accident was palpably unreasonable.
To put it another way, as we have said, illumination in the area was undisputably poor. Within five days after the accident, and following a call by the Chief of Police to PSE & G, four new street lamps, among others, were installed along the westbound side of Plainsboro Road which runs along the park entrance and which would have provided better lighting for the side of the crosswalk plaintiff was using. Indeed, one of the new lamps is located at the north side of the crosswalk and now illuminates the westbound lanes. This new illumination, therefore, was clearly feasible and could have quickly been installed. Its cost was not prohibitive. The question was whether the Township's failure to obtain this better illumination sooner was palpably unreasonable.
In discussing what the Legislature meant by palpably unreasonable governmental behavior, we said in Williams v. Phillipsburg, 171 N.J.Super. 278, 408 A.2d 827 (App.Div.1979), cited with approval in Kolitch v. Lindedahl, 100 N.J. 485, 493, 497 A.2d 183 (1985):
We conclude that the legislative intention was to allow sufficient latitude for resourceful and imaginative management of public resources while affording relief to those injured because of capricious, arbitrary, whimsical or outrageous decisions of public servants. We have no doubt that the duty of ordinary care, the breach of which is termed negligence, differs in degree from the duty to refrain from palpably unreasonable conduct. The latter standard implies a more obvious and manifest breach of duty and imposes a more onerous burden on the plaintiff.
[171 N.J.Super. at 286, 408 A.2d 827.]
Palpably unreasonable conduct is, of course, more than mere negligence; but we have said that it does "not necessarily mean `very' negligent, `grossly' negligent or `extraordinarily' negligent," Holloway v. State, 239 N.J.Super. 554, 560, 571 A.2d 1324 (App.Div.1990). The Supreme Court reversed in part our decision in Holloway, but in doing so, it quoted the above language. Holloway v. State, 125 N.J. 386, 404, 593 A.2d 716 (1991). As posed by the Supreme Court, the inquiry is whether no prudent person could approve of the governmental entity's action or inaction. Id. at 403, 593 A.2d 716; Kolitch v. Lindedahl, supra, 100 N.J. at 493, 497 A.2d 183.
The jury here was properly charged on the "no prudent person could approve" language and, we, thus, will consider the issue in that context. The test requires consideration of what the Township did in the face of all of the attendant circumstances, including, of course, the extent of the known danger and what it considered to be the need for urgency.
*1011 These are the facts which bear upon that issue. Citizen concerns over the safety of Plainsboro Road in this area date, as far as the record reveals, as early as 1991.[2] The Traffic Safety Officer for the Township as of mid-1995, Officer Molnar, who was principally responsible for initiating the remedial efforts at issue here, acknowledged that the problems with the lighting and pedestrian problems "just didn't occur overnight."
As to this particular crosswalk, a letter from a resident in the area to Officer Molnar in September 1995 stated "I have tried on more than one occasion to be aware of pedestrians at the Park crosswalk, but because the road is so wide here and traffic moving rather fast, I am not always able to see pedestrians in time to stop...." And, a December 1995 report from the Township Engineer suggested various options to alleviate the danger at this particular crosswalk, including a pedestrian overpass, the construction of a traffic signal with pedestrian activation, or a flashing pedestrian crossing warning sign.
Of particular importance here, the concerns were not limited just to the particular pedestrian crossing in which plaintiff was struck. As expressed in a July 12, 1995, letter from the Chief of Police responding to a citizen complaint of the dangers faced by pedestrians attempting to cross Plainsboro Road, the area focused upon was Plainsboro Road "between the Scudders Mill intersection and the Cranbury Township line." This area encompasses the crosswalk at issue here. Officer Molnar testified rather emphatically that the dangers to pedestrians crossing Plainsboro Road "existed throughout, I would call it, the Plainsboro Corridor...." This corridor encompassed three crosswalks, including the crosswalk here, and the officer stated that "the problem for pedestrians and the problem for motorists were the same at these crosswalks ... throughout the corridor."
Although there were a number of citizen complaints prompting the Township's attention, the real cause for concern was the fact that in 1995 and 1996 this "corridor" had been the site of three prior accidents involving pedestrian crossings and serious injury and death. It is somewhat difficult to accurately place those accidents in relationship to the location of plaintiff's accident. Along with the trial testimony, we have considered the police reports of these other accidents, which have been included in the appendix but which were not marked or placed in evidence during the trial, and various "not to scale" diagrams of the area, which the record seems to reflect were marked during the trial. As best we can tell, it seems that the first of the prior accidents occurred on September 14, 1995, at 8:46 p.m. on the eastbound side of Plainsboro Road one-tenth of a mile east of Deer Creek Drive, between Deer Creek Drive and Brittany Drive. Just east of Brittany Drive is Thoreau Drive, both of which T-intersect with the eastbound side of Plainsboro Road. The crosswalk at issue here runs from the corner of Thoreau Drive across Plainsboro Road to a point near the park entrance on the westbound side of Plainsboro Road. The first accident, then, occurred within a block of the crosswalk.
In this area, prior to and at the time of plaintiff's accident, there were a number of street lamps lighting the eastbound side of Plainsboro Road. There are no corresponding street lamps between the intersection of Hunters Glen Drive/Deer Creek Drive and the intersection of Tamarron Drive/ George Davidson Drive illuminating the westbound lanes of Plainsboro Road, in between which lies the park. But there are lamps at the corners of the Hunters Glen Drive intersection and Tamarron Drive intersection. At the time of the *1012 accident in September 1995, the investigating officer observed that the street lamp on the eastbound side of Plainsboro Road near the site of the accident was "burned out and the area was darkened."
The second of the prior accidents occurred on February 28, 1996, at 6:39 p.m., forty-one feet east of Hunter Glen Drive/ Deer Creek Drive and, as the first, between Deer Creek Drive and Brittany Drive in the eastbound lanes of Plainsboro Road. As we have said, just east of Brittany Drive is Thoreau Drive and the crosswalk at issue here. The police report of that accident notes that it was dark out and while the area was illuminated with street lamps on the eastbound side of the road, even so "it is not a well lit area." The third of the prior accidents occurred on March 8, 1996, at 6:44 p.m. at Centers Drive East, near another crosswalk, and seems to have occurred within three or four blocks west of the accident here.
However near or far away, all three accidents had occurred within the Plainsboro Road "corridor" that was the focus of the Township's concerns and actions. Yet, the jury was not allowed to hear that all three formed the primary motivating force behind the Township's remedial efforts.
As to what had been done prior to plaintiff's accident on January 3, 1997, these are the facts. On September 19, 1995, Officer Molnar met with Christopher Barrett, the New Jersey Department of Transportation (NJDOT) Traffic Engineer Liaison for Middlesex County, who investigated safety issues along Plainsboro Road, including the crosswalk where plaintiff was injured. Based on Barrett's suggestions, the following week Officer Molnar wrote a memo, dated September 26, 1995, to the Chief of Police. Specifically, Officer Molnar suggested that a "flashing beacon pedestrian activated signal" be installed at the crosswalk, at an estimated cost of $30,000 to $40,000. However, because applications for such traffic signals can take over two years before NJDOT approval, he recommended short-term solutions, one of which was a reduction of the speed limit. On September 28, 1995, the Township did request NJDOT's approval for a reduction of the speed limit on Plainsboro Road from fifty to forty miles per hour.
Of prime concern, however, for Officer Molnar was improvement in the lighting in the area. In February 1996, he first contacted PSE & G to obtain its evaluation, as it would be PSE & G's responsibility to implement any lighting improvements requested. The product of that contact was a March 14, 1996, memorandum to the Chief of Police. Plaintiff's use of the contents of this memorandum was restricted by the trial judge. The following is the scope of what was conveyed to the jury:
Q I show you P-4 for identification [the March 14, 1996, memo] and ask you if you authored that memorandum?
A Yes, I did, sir.
Q And in the memorandum, you use the word dramatically?
A Yes, sir.
Q What were you referring to? What were you trying to convey there?
A Trying to convey any additional lighting would increase lighting visibility out there than what is out there at present.
That this memo encompassed the specific crosswalk here is clear from the following exchange:
Q And when you say out there, what section of Plainsboro Road were you referring to?
A The incident that we are here for. The motor vehicle accident that Mr. Schwartz was involved in.
Q So that on March the 14, you issued a memo about increasing the lighting at the instant crosswalk where Mr. Schwartz was, correct?
A Correct, sir. I should say
Q Just answer my question.
A I'm sorry, say that one more time, sir.
*1013 Q What did you feel that what we had out there was minimal?
A It was minimal, yes, sir.
Q And did you feel in writing that memo any additional lighting would hopefully, in your mind increase visibility out there for pedestrians or vehicles?
A Correct, sir.
The memo itself, which plaintiff was not permitted to put in evidence or have Officer Molnar fully testify to, expresses the awareness of the danger and the need for urgency in far more graphic terms. It states in full:
This is a preliminary memo on the street lighting situation on Plainsboro Road.
I strongly feel that an immediate remedy would be to have Public Service Electric and Gas (PSE & G) install 150 watt high-pressure sodium street lamps where the existing street lamps are now in place at the designated crosswalks. This would increase visibility dramatically as opposed to what is presently there now. The cost of this would be $8.65 per month for each new lamp installed.
PSE & G advised me that we would need to send a letter on department letterhead, signed by the Chief of Police requesting new lamps. I would prepare this letter, as I have all the necessary information. PSE & G would then conduct their own investigation on our request. PSE & G would have these street lamps installed in approx[imately] 2-3 weeks, maximum time.
I am only requesting four (4)lamps to be upgraded that are presently non-high-pressure sodium street lamp. If you approve this, we may not have to install any other street lamps, but anything is better than what is presently out there now.

This request would be made in my final memo to you as the first step in the upgrade process of the entire re-lighting of Plainsboro Road street lamps. The entire cost at this phase that the Township would have to pay per month would be $34.50 for all four lamps. I feel that this would be a far better thing to pay than any law suit brought on by a litigant and it could possibly prevent another pedestrian wreck.

[Emphasis added.]
In addition, in a March 21, 1996, memo from Officer Molnar to the Chief on the "street lighting on Plainsboro Road" and which plaintiff could not use given the judge's evidence ruling, Officer Molnar stated:
This is a follow-up memo to you from my previous memo dated March 14, 1996 concerning this issue. Please see the attached copy of that memo. I have also included a diagram of Plainsboro Road from Centers Drive East to the entrance/exit to Morris Davidson Park.

There have been three (3) wrecks in the area involving a vehicle with either a pedestrian or a pedalcyclist which resulted in injuries or a fatality. There has been one (1) fatality, a pedestrian, that occurred on February 28, 1996, case # 96-01790. This was not the fault of the vehicle or its driver. There has been one (1) wreck involving a pedestrian and one (1) wreck involving a pedalcyclist which resulted in injuries for the past three (3) years. All wrecks were the fault of the pedestrian/cyclist and the lack of illumination played a part in each wreck.

[Emphasis added.]
The memo further outlines in detail recommended upgrading of the wattage on the existing street lamps and includes the relatively low cost thereof. If approved by PSE & G, it was estimated that the work would take two to three weeks to complete. The memo continues, "[o]nce these lamps are upgraded, then we could examine the area for any further lighting needed, be it to add a street lamp to an existing pole ... or to install a utility pole with a street lamp which the Township must pay for, or any combination thereof." The particular *1014 crosswalk at issue here was focused upon, with Officer Molnar stating:
Lastly would be for the Township to decide what, if anything, they would like to do with the pedestrian crosswalk area to/from Morris Davidson Park, be it a flashing beacon light system, elevated pedestrian walkway, etc. I feel that whatever is going to be done at this crosswalk, the same should be done with the other crosswalk to/from Centers Drive East. This would work in conjunction with the suggestions of the Township Engineer's office for this particular problem.
It was only the less costly upgrading of the wattage in the existing street lamps that was the then immediate recommended course of action. In the area of the crosswalk at issue here, those improvements did not benefit the westbound side of Plainsboro Road between Hunters Glen Drive/ Deer Creek Drive and Tamarron Drive/ George Davidson Drive, including the site of plaintiff's accident.
On April 2, 1996, after the approval of the increased wattage for the existing street lamps, the Township submitted its formal request to PSE & G for the lighting improvements. The request stated, "[w]e are requesting this be a rush order, as we have had one pedestrian killed and a second pedestrian seriously injured while they were crossing Plainsboro Road within the past month." Officer Molnar was permitted to testify only to the language "we are requesting this to be a rush order...." The remainder was stricken and a redacted version of the request was placed in evidence.
Particularly harmful to plaintiff, not only was Officer Molnar not permitted to testify to the real motivation for the request, but he was permitted to cast the reason for the "rush order" in a far more benign fashion. When asked why the request was made as a rush order, he said:
This was a discussion that I had with the people at Public Service and this would help improve or quicken their response out there. I have known that Public Services takes, has a lengthy time for requests for installation of this because of projects that they have throughout New Jersey and this hopefully would quicken the response from Public Service to come out there.

[Emphasis added.]
When asked whether there were other reasons, he said "[j]ust to get out there and do this. Something to improve it, that's all." And in response to questions from the Township attorney, Officer Molnar was prompted to tell the jury that it was the increase in the use of the park and the use of the crosswalk that "prompt[ed] him to take ... action."
In any event, within two or three weeks, PSE & G increased the lamp wattage in the targeted "corridor" area. In addition, in May 1996, DOT approved a reduced speed limit reduction to forty-five miles per hour.
The increased street lamp wattage, apparently, was not sufficiently helpful because in September 1996 Officer Molnar requested from PSE & G a second lighting survey of the area. It seems clear that, at that time, new street lamps were deemed necessary, including new lamps on the westbound side of Plainsboro Road from the Hunters Glen Drive/Deer Creek Drive intersection to Tamarron Drive/ George Davidson Drive intersection along the park area. The new lamps included those that ultimately were installed five days after the accident, one of which now illuminates that part of the crosswalk in which plaintiff was struck.
Unfortunately, the request from the Township to PSE & G at that time was based upon a diagram that did not include these lamps. This request, dated September 23, 1996, again contained the language "[w]e are also requesting this be a rush order as this area has recently had several pedestrian v. motor vehicle accidents that have caused serious injuries and in one case death." As with the earlier request, *1015 Officer Molnar was permitted only to testify that the request was "a rush order" and a redacted version of the September 23, 1996, request was admitted in evidence. Again, the officer was permitted to downplay the urgency. When asked why the request was another "rush order," he replied "[s]ame thing, to get Public Service moving in there. Same thing as previously. To get Public Service moving in there."
Sometime in October, and before PSE & G had responded to the September 23, 1996, request, Officer Molnar realized the new street lamps that he thought were needed had been omitted from that request. On October 29, 1996, therefore, he met with the PSE & G consultant to discuss those new installations, along with others. The upshot was a November 11, 1996, memo from Officer Molnar to Detective Sergeant Furda, Special Services. In part, the memo states:
This plan calls for seven (7) new utility poles to be planted on the westbound side. Three (3) of these new poles would be planted between Hunters Glen Drive and the pedestrian crosswalk to/ fro [sic] Morris Davidson Park-Thoreau Drive [the crosswalk at issue here]. One of these new poles would cover this crosswalk which is presently unlit except from the eastbound berm.
On November 18, 1996, the Township made its formal order to PSE & G for the improvements outlined in Officer Molnar's memo, again requesting a "rush order." As with the prior requests the November 18 report explained the need for urgency "as this area has recently had several pedestrians v. motor vehicle accidents that have caused serious injuries and in one case death." This language was also excised from the request. As redacted, the November 18, 1996, document was admitted in evidence.
Between November 18, 1996, and January 7, 1997, PSE & G did not do the requested work. At some point during this time, the date of which is not recalled by any witness, Officer Molnar called PSE & G to find out what had happened to the request and discovered it had been lost. There is no indication that beyond that contact, anything further was done to emphasize the need for urgency until plaintiff's accident.[3]
It should be evident from the above recitation that the evidence that was excluded here struck directly at the heart of the palpably unreasonable issue. Consideration of whether the Township's actions were palpably unreasonable requires an understanding of not only what was done, but what the Township's motivating concerns were. Simply put, the greater the risk of danger known by the Township and sought to be remedied, the greater the need for urgency. Should the knowledge that serious injury and death had occurred in the area and that lack of sufficient lighting was thought to have been a causative factor, have prompted a prudent governmental entity to immediately seek the new lamps that were ultimately installed five days after the accident? Was the omission of the new lamps in the September 23, 1996, request to PSE & G palpably unreasonable? If not, when PSE & G had not complied with the November 18, 1996, request within the two to three weeks it took to do the first work, was the failure to do what was obviously done after the accident to prompt PSE & G to move quickly, palpably unreasonable? The answer to these questions obviously requires *1016 an understanding of the need to act quickly. The jury not only was not allowed to hear of that need, but it was given a skewed view of the reason for the "rush orders."
Moreover, the prejudice to plaintiff was enhanced by the evidence as to prior accidents that the trial judge did permit. In this respect, the Township was permitted to provide evidence that no accidents had previously occurred at this particular crosswalk. Counsel reminded the jury of that during his summation.
The judge's evidence rulings are, of course, discretionary. E.g., Harris v. Peridot Chem. (N.J.), Inc., 313 N.J.Super. 257, 278-79, 712 A.2d 1181 (App.Div.1998). Here, the basis for those rulings was the view that the dangerous condition was the particular crosswalk in which plaintiff was injured and that, therefore, pursuant to Norris v. Borough of Leonia, 160 N.J. 427, 447-48, 734 A.2d 762 (1999), it is only prior accidents at the particular crosswalk that would be relevant.
Norris, in part, involved whether notice of dangerous conditions at nearby locations was sufficient to put the defendant municipality on notice of the condition of the specific property where plaintiff was injured. There, the plaintiff suffered severe injuries when the "curb in front of her home ... collapsed as she stepped onto it...." Norris, supra, 160 N.J. at 429, 734 A.2d 762. Plaintiff admitted that prior to her accident she had not complained to the Borough about the poor condition of the curb adjoining her home; instead she relied on her neighbor's affidavit that he had telephoned the Borough about problems with the curb adjoining his own home. Id. at 447, 734 A.2d 762. The Court noted that even assuming the validity of the neighbor's affidavit, the neighbor's complaint dates were not specified and the neighbor's house was actually across the street from the plaintiff. Ibid. In other words, "[the neighbor's] complaints about his own curb cannot serve as notice of a defective curb at a different location." Id. at 447-48, 734 A.2d 762. Because the required notice was therefore absent, the Court affirmed the award of summary judgment in the Borough's favor. Id. at 448, 734 A.2d 762. Compare Wymbs v. Township of Wayne, supra, 163 N.J. at 533, 750 A.2d 751 (allowing evidence of prior accidents at same accident site as evidence of "notice").
Here, it is not notice of the danger at the crosswalk that was the critical issue. It is undeniable that the Township long had notice of the poor illumination at that crosswalk, as well as in the general area. Moreover, the danger at that crosswalk cannot be separated from the perceived danger of the broader "corridor" area which encompassed the site of the prior accidents. That is because the issue for the jury to decide was not notice or that there was a dangerous condition, but whether the Township's reaction to the known danger was palpably unreasonable. As we have previously said, consideration of that requires knowledge of all the attendant circumstances. The most critical of those circumstances was the fact that three very serious pedestrian accidents had occurred in the "corridor," as it was those accidents which shaped the Township's concerns and "rush" requests. Indeed, in this respect, in his March 21, 1996, memo to the Chief of Police, in which Officer Molnar outlined what he thought should be done and which plaintiff was not able to present to the jury, Officer Molnar said:
As was previously related in my original memo, in order to request this upgrade a letter must be written to PSE & G (Public Service Electric and Gas) and signed by you. I would prepare this letter and I would include in it the reasons for our request, which would be increased illumination to the roadway for the pedestrians and the motorists and a series of wrecks involving pedestrians/pedalcyclists which resulted in death or injury.

[Emphasis added.]
We previously have mentioned evidence of prior accidents or other incidents invoking danger in the context of the palpably *1017 unreasonable Tort Claims Act factor. For instance, in Roe v. New Jersey Transit Rail Operations, 317 N.J.Super. 72, 82, 721 A.2d 302 (App.Div.1998), certif. denied, 160 N.J. 89, 733 A.2d 494 (1999), we held that a jury could conclude that the actions New Jersey Transit took in permanently bolting open a gate on its property allowing public access to an area known to be frequented by criminals was palpably unreasonable in view of known danger and the relatively minor expense and inconvenience of either relocating the gate or keeping it locked. See also Speaks v. Jersey City Hous. Auth., 193 N.J.Super. 405, 410, 474 A.2d 1081 (App.Div.), certif. denied, 97 N.J. 655, 483 A.2d 177 (1984) (where plaintiff was struck by an object thrown or dropped from a stairwell window, jury could conclude housing authority was palpably unreasonable in failing to repair a window for over two weeks when it was aware that objects had previously been dropped or thrown from the window and the authority had a full-time repair person for windows who apparently did not fix the window in sufficient time). Cf. Harris v. Peridot Chem., supra, 313 N.J.Super. at 280, 712 A.2d 1181 (in the context of a non Tort Claims Act personal injury trial, we said, "evidence of other acts may be offered to show ... the magnitude of the defect or danger involved....").
We are convinced here that the jury could not fairly evaluate plaintiff's claim that the Township's handling of the known danger on Plainsboro Road to pedestrians in the area of his accident was palpably unreasonable without knowledge of the fact that the Township's concern for urgent remedial action was prompted by its knowledge that accidents resulting in death and serious injury had occurred in the area. And, to the extent the jury was advised of what the motivation was, that evidence was highly prejudicial to plaintiff without the full story, because it conveyed rather benign motivating forces were at play. In light of the efforts that were taken, without the essence of the urgency, and being told only that no accidents had occurred at the crosswalk, the jury may have easily thought the Township's actions were nothing less than exemplary. Had it known that the prior accidents and the resulting serious injury and death were what was prompting the Township, the jury may very well have concluded that under those circumstances new lights in the area should have been a priority from the beginning and the failure to obtain them sooner was palpably unreasonable. The jury, too, could have determined that the Township failed to forcefully and speedily push PSE & G to respond to the November 18, 1996, "rush" request, and that that was palpably unreasonable.
We briefly touch upon the defendant's concerns that admission of the prior accidents will open the trial to burdensome, unnecessary and potentially confusing inquiry into the specifics of each accident. That need not be so. The Township's concern was prompted by the fact that there were prior accidents in the area involving pedestrians, that serious injury and death had occurred, and that the lighting in two of the three accidents was observed as poor. The first two facts are undisputed and can be stipulated. So too the third, for while one might dispute whether, in fact, poor lighting was a causative factor in each accident, it is undisputed that poor lighting was noted and thought by the Township to have been contributing.
Moreover, unlike the prior accidents sought to be used in Wymbs, supra, to establish the existence of a dangerous condition at the location of the plaintiff's accident, that was not the purpose of the prior accidents here. That the crosswalk in which plaintiff was injured was a dangerous condition was not the key issue. As we have said, it was whether the Township's handling of the danger was palpably unreasonable. Wymbs `requirement, therefore, that a plaintiff seeking to use prior accidents to establish a dangerous condition must show "(1) the same or substantial similarity of circumstances between the prior accident and the one involved in the case on trial, and (2) the *1018 absence of other causes of the accident," Wymbs ex rel. Wymbs v. Township of Wayne, supra, 163 N.J. at 536, 750 A.2d 751, is not applicable here.
Simply put, the jury should have no need to know of the details of each accident beyond what the Township considered in shaping the remedial actions and as reflected by the excised portions of the various memos and "rush orders." We are convinced, therefore, that admission of the evidence relating to the prior accidents and the Township's concerns arising therefrom and prompting its remedial efforts can be properly limited so as to avoid any N.J.R.E. 403 concerns of confusion of the issues or undue delay.
Reversed and remanded for a new trial.
NOTES
[1] Prior to the trial, plaintiff had settled with defendants Darryl Johnson and Public Service Electric and Gas (PSE & G).
[2] In this respect, the jury heard evidence that in May 1991, the then recreation director expressed to the town administrator that she had "a concern about children crossing [Plainsboro Road] once the [Morris Davidson] park is open."
[3] In addition to the lighting improvement efforts, the Township reminded its residents about general safety procedures for drivers and pedestrians using crosswalks. Through its community policing newsletter, "PRO COP," and prior to plaintiff's accident, the Township sent these reminders to all Township residents on April 15, 1996, July 8, 1996, Autumn 1996, and Winter 1996/1997. Officer Molnar also wrote an article on the same subject for a September 1996 issue of the Plainsboro Reporter. In October 1996, as well, a pedestrian banner was installed 263 feet west of the crosswalk at issue here. It survived but an hour or so as Officer Molnar thought it was unsafe in high winds.