35 A.3d 653

DONALD T. POLZO, AS EXECUTOR FOR THE ESTATE OF MATHI KAHN–POLZO, AND DONALD T. POLZO, INDIVIDUALLY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. COUNTY OF ESSEX, DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TOWNSHIP OF MILLBURN, STATE OF NEW JERSEY, AND PUBLIC SERVICE ELECTRIC AND GAS, DEFENDANTS.

Argued September 26, 2011—Decided January 18, 2012.

54

*Jeffrey B. Beacham* argued the cause for appellant and cross-respondent (*McGivney & Kluger,* attorneys; *Mr. Beacham* and *Michael R. Sarno* on the briefs).

*E. Drew Britcher* argued the cause for respondent and cross-appellant (*Britcher, Leone & Roth,* attorneys; *Mr. Britcher* and *Jessica E. Choper* on the briefs.)

*Robert F. Renaud* submitted a brief amicus curiae on behalf of New Jersey State League of Municipalities (*Palumbo & Renaud,* attorneys).

Justice ALBIN delivered the opinion of the Court.

We must determine whether a county can be held liable for a fatal accident that occurred when a person lost control of her bicycle while riding across a two-foot wide, one-and-one-half inch depression on the shoulder of a county roadway. Although pot-holes and depressions are a common sight on New Jersey's roads and highways, public-entity liability is restricted under the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3. Liability attaches to a public entity only when a pothole or depression on a roadway constitutes a dangerous condition; the public entity either causes the condition or is on actual or constructive notice of it; and, if so, the public entity's failure to protect against the roadway defect is palpably unreasonable. *See N.J.S.A.* 59:4–2.

Here, the trial court granted summary judgment in favor of Essex County and dismissed plaintiff's wrongful-death and survival-action lawsuit, finding that the County did not have actual or constructive notice of a dangerous condition of the roadway's shoulder and, alternatively, that the County did not act in "a palpably unreasonable" manner by failing to repair the depression. The Appellate Division reversed, concluding that a jury could determine that the County affirmatively caused a dangerous condition of property by not having in place a proactive program to inspect its roadway for the type of defect that was presumably responsible for the fatal accident in this case.

We now hold that the Appellate Division erred in suggesting that public entities may have to employ the equivalent of roving pothole patrols to fulfill their duty of care in maintaining roadways free of dangerous defects. In this case, just five weeks before the accident, while filling some potholes, the County surveyed the entire length of the subject roadway. Even when viewed in the light most favorable to plaintiff, we cannot conclude that the County was on constructive notice of a "dangerous condition" on the shoulder of its roadway that "created a reasonably foreseeable risk" of death, or that the County's failure to correct this depression before the tragic accident was "palpably unreasonable." *See* *N.J.S.A.* 59:4–2.

We therefore reinstate the grant of summary judgment in favor of the County and dismiss the complaint.

## I.

### A.

On August 18, 2001, at approximately 12:20 p.m., a group of five experienced bicyclists was riding downhill on the westbound shoulder of Parsonage Hill Road in the Township of Millburn.[1] Mathi Kahn–Polzo, one of the five, was traveling behind

---

1 In considering whether to grant a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving

the pack at a speed of approximately fifteen miles-per-hour when her bicycle traveled over a circular depression that was two feet in diameter reaching a depth of approximately one-and-one-half inches. She lost control of her bicycle and fell to the pavement, suffering a catastrophic head injury, despite wearing a helmet. She died twenty-six days later without ever regaining consciousness.

## B.

In September 2002, plaintiff Donald T. Polzo, Mathi's husband, filed a wrongful-death and survival action against Essex County, Millburn Township, and the State of New Jersey, alleging that all three entities were responsible for a dangerous condition on a public roadway. Parsonage Hill Road is owned, controlled, and maintained by Essex County. Eventually, the State and Millburn Township were dismissed from the case, leaving Essex County as the only defendant.

This case has followed a tortuous procedural path to the present appeal. Twice the trial court applied the public-entity immunity provisions of the Tort Claims Act and dismissed plaintiff's action on summary judgment, and twice the Appellate Division reversed and reinstated the case. In the first round of appeals, this Court granted the County's petition for certification and then reversed the Appellate Division on the ground that plaintiff's case rested almost entirely on an expert's net opinion. We remanded to the trial court for plaintiff to further develop the record.

We now present the record before us.

---

party. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 A.2d 146 (1995); *see also R.* 4:46–2. An appellate court reviewing a grant of summary judgment applies the same standard governing a trial court. *Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 330, 9 A.3d 882 (2010). Because this matter comes before us on appeal from the trial court's grant of summary judgment in favor of defendant County of Essex (the moving party), we view the evidence, as we must, in the light most favorable to plaintiff Donald T. Polzo.

## C.

Significant to this case is an understanding of two types of defects that may impair the surface of a road—potholes and depressions. According to the deposition testimony of Assistant Essex County Supervisor of Roads, Salvatore Macaluso, a pothole is "anything an inch-and-a-half or deeper where the pavement is actually broken out."[2] In contrast, a depression is a "dip" in the road without any break in the roadway surface. Macaluso indicated that a roadway hole less than an inch-and-a-half would not be repaired because "the asphalt is not going to adhere to it." Similarly, small depressions would not be repaired because the asphalt would not stick.[3]

Macaluso stated that a pothole measuring an inch-and-one-half or greater in depth on the shoulder of a roadway would be repaired if the County "had knowledge" of it, but that a depression of the same size would *not* necessarily be repaired. Typically, the County would make repairs outside the designated travel lanes—such as on the roadway's shoulder—only when an "edge of [the] pavement [is] actually br[eaking] out into the travel lane" or the "stone or asphalt has washed away."

County roadway repairs were made when complaints were received from the police, town officials and residents, and motorists. Most of those complaints, apparently, were communicated by telephone. In addition, Macaluso inspected roads that either had not been repaved in years or had been the subject of pothole complaints or other pavement problems.[4] The County had no

---

[2] Throughout his brief, plaintiff refers to the roadway defect at issue as a depression, not a pothole.

[3] An example of what the County has repaired is a depression in *the middle of a roadway* in Cedar Grove that measured three feet in length, two feet wide, and four inches in depth.

[4] Generally, a county road is repaved about every ten years.

other systematic program for the inspection of its roadways for defects.

Parsonage Hill Road—the roadway at issue—had been repaved five to seven years before the accident. Just five weeks before the accident, on July 6, 2001, the County received a complaint of a pothole on that road. The County's records disclosed that one of its employees, T. Burton, repaired the targeted pothole and inspected the "entire length" of the 2.6-mile road, filling other potholes. Burton was not deposed by either party during the discovery period. Consequently, we do not know whether he, or another crewmember, checked the shoulder of Parsonage Hill Road for potholes or depressions. Nor do we know whether they observed the depression at issue or, if they did, what their eye-ball estimate of the depth of the depression was at that time.

Macaluso reviewed a police photograph of the depression on the roadway's shoulder that is claimed to be the cause of Kahn–Polzo's accident. He estimated that the depression was "an inch-and-a-quarter" in depth.[5] At his deposition, Macaluso averred that he would repair a depression that was more than an inch-and-a-half in depth. He even suggested that the road depression at issue would have been repaired if the County "had knowledge of it."

Plaintiff's cause of action rests largely on Dr. Kuperstein's three expert reports and his more recent deposition testimony. We initially deal with the first two reports because they were before the trial court when it entered summary judgment against plaintiff in the first procedural round. In his May 2004 report, Dr. Kuperstein came to the following conclusions: (1) Kahn–Polzo rode her bicycle into the depression on the shoulder of Parsonage Hill Road, fell, and suffered fatal injuries; (2) the depression was a "dangerous or hazardous condition" that "was a direct or

---

[5] The photograph—taken on the date of the accident—depicts a depression in the roadway with a ruler in it, apparently for measurement purposes. However, the police report filed in response to the accident does not indicate the depression's depth.

proximate cause of the accident" and her ensuing injuries; (3) "the subject depression would not have been readily apparent to a bicyclist"; (4) the road depression "should[ ] have been noticed by those responsible for maintenance of Parsonage Hill Road" because it existed for a period of "months if not years"; (5) the accident and injuries suffered by Kahn–Polzo were a foreseeable consequence of the dangerous condition of the roadway; and (6) repairing the roadway depression would have been a "[r]elatively low-cost" operation.

In a July 2004 report, Dr. Kuperstein concluded that Essex County's failure to "have an accepted and proper procedure or system ... to identify and repair roadway surface defects" was "directly linked to the subject depression and accident that occurred."

In response, the County submitted an expert report authored by Irving Ojalvo, Sc.D. and Kristopher Seluga, S.M. in which they opined that it was impossible to determine the cause of the accident. According to the County's experts, the "subject depression was a relatively benign road feature and presented no serious hazard to a cyclist traveling at a reasonable speed." Conducting their own tests, the experts concluded that a bicyclist "could easily ride over the depression at speeds up to 15 mph without any loss of control." They observed that a "cyclist must be prepared to encounter many obstructions" on a roadway, "such as potholes, tree branches, leaves and other road debris," and that "a cyclist assumes a level of responsibility when traveling on a public roadway, which is not designed as a bike path."

### D.

Based on that record, the trial court granted summary judgment in favor of the County. It determined that, even assuming a dangerous condition of the roadway, there was insufficient evidence from which a reasonable jury could conclude that the County acted in a palpably unreasonable manner.

In an unpublished opinion, the Appellate Division reversed, finding that, based on the most favorable evidence to plaintiff, the County was on constructive notice of a dangerous condition of its roadway and that the issue of whether the County acted in a palpably unreasonable manner—by not repairing the depression at least five weeks before the accident—was for the jury to decide.

In turn, this Court reversed the Appellate Division because of its concern that the conclusion reached in Dr. Kuperstein's expert report—that the County was on constructive notice of a dangerous condition of its property—appeared to be a "net opinion." *Polzo v. County of Essex (Polzo I)*, 196 *N.J.* 569, 583–84, 586, 960 *A.*2d 375 (2008). In particular, we questioned whether there was a sufficient basis for Dr. Kuperstein's opinion that the alleged dangerous condition existed for a sufficient period of time before the accident such "that the public entity should have discovered it." *Id.* at 586, 960 *A.*2d 375. We observed that if plaintiff's proofs fell short of proving constructive notice, an element necessary to establish public-entity liability, then plaintiff's complaint would have to be dismissed. *Ibid.* In that event, the issue of whether the County acted in a palpably unreasonable manner would not have to be reached. *Ibid.* We noted that the trial court "sidestepped" "whether the County was on constructive notice of the alleged dangerous condition" and that the Appellate Division "too expansively determined" the issue. *Ibid.* On remand, we directed the trial court to review the record and, in its discretion, decide whether to supplement it. *Ibid.* On such a record, we expected the trial court "to determine whether plaintiff's proofs satisfy all of the elements" for public-entity liability based on an "alleged dangerous condition of public property." *Id.* at 586–87, 960 *A.*2d 375.

## II.

### A.

On remand, plaintiff supplemented the record with a third report from Dr. Kuperstein dated January 29, 2009. In that

report, Dr. Kuperstein opined that the depth of the depression at the time of the accident—based on the same police photographs reviewed by Macaluso—was approximately one-and-one-half inches. When deposed, he "conservative[ly]" estimated the depression's depth to be one-and-three-eighths inches, although he concluded that an estimate of one-and-one-half inches was "closer" to the truth. He further noted in his report that when he inspected Parsonage Hill Road two-and-one-half years after the accident, the depression had grown to three inches in depth. He concluded that the depression was "due to an erosion of the underlying subsurface" of the road and deduced that the depression would have been "in a similar state" approximately two years before the accident.

Dr. Ojalvo, the County's expert, was also deposed. He stated that the depression, which he observed on a site visit, was not "open and obvious." He indicated that the reason for the depression could not be determined without an excavation. Dr. Ojalvo agreed that the depth of the depression would not have changed from the time of the July 2001 inspection of Parsonage Hill Road to the date of the accident five weeks later.[6]

## B.

The trial court on remand again granted summary judgment in favor of the County. The court accepted that the depression was the same depth on the accident date as it was five weeks earlier when a County maintenance crew was filling potholes on Parsonage Hill Road. The court, however, found that the depression was not of such an obvious nature that it should have been discovered through the exercise of reasonable diligence. Therefore, it concluded that the County was not on constructive notice of a dangerous condition of property. Having reached that determina-

---

[6] In an exchange between plaintiff's counsel and Dr. Ojalvo, there was discussion of a Mr. Gunnel having made a site inspection a month after the accident and having estimated—without measuring—the depression to be approximately two inches in depth.

tion, the court further concluded that the proofs were insufficient to establish that "the County was palpably unreasonable in failing to repair the depression."

## C.

In an unpublished opinion, the Appellate Division first concluded that the record could not support a finding that the County was on actual or constructive notice of the depression. The panel observed that Dr. Kuperstein failed to explain how he arrived at his opinion that two years before the accident the depression "'would have been in a similar state.'" Having determined that the County was not on actual or constructive notice of a dangerous condition under *N.J.S.A.* 59:4–2(b), the panel then noted an alternative theory of public-entity liability under *N.J.S.A.* 59:4–2(a). The panel reasoned that liability could be premised on "a negligent act or omission by a public employee acting within the scope of [his] employment" that actually created the dangerous condition. The panel indicated that Dr. Kuperstein did not render a "net opinion" by concluding that "safe and accepted engineering practices and procedures mandate a proactive response to pavement defects." The panel asserted that

[i]n the absence of any routine inspection program, a jury reasonably could conclude that it is the failure to have a maintenance program that called for routine inspections of the roadway and shoulder that could likely result in an injury of the kind sustained by Kahn–Polzo, and that the failure to have such a program was palpably unreasonable. *N.J.S.A.* 59:4–2.

Solely on this issue did the panel reverse and remand for trial on the County's potential liability pursuant to *N.J.S.A.* 59:4–2(a).[7]

We granted the County's petition for certification and plaintiff's cross-petition. *Polzo v. Cnty. of Essex*, 205 *N.J.* 100, 13 *A.*3d 363 (2011). We also granted The New Jersey State League of Municipalities leave to participate as *amicus curiae*.

---

[7] It is worth noting that this issue was first raised by plaintiff in oral argument before the Appellate Division.

## III.

The County primarily argues in its petition that the Appellate Division erred because there is no credible evidence that "the County's failure to have a routine inspection program in place proximately caused the resulting accident." Moreover, the County asserts that it "had a program to maintain its roadways" and that it cannot be held liable under *N.J.S.A.* 59:4–2(a) "for failing to repair a small depression" on a roadway's shoulder of which it had no notice "in a county with hundreds of miles of road[s]."

Plaintiff argues in his cross-petition that, to survive summary judgment, he presented sufficient evidence that "the County had constructive notice of the dangerous condition of the subject depression in the roadway." He asserts that the depression should have been discovered when the County repaired and inspected Parsonage Hill Road on July 6, 2001, and that Macaluso's deposition testimony—that the County probably would have repaired the depression had it been noticed—is sufficient evidence for the case to go to the jury.

Amicus League of Municipalities submits that the Appellate Division improperly equated creating a dangerous condition on a roadway with not discovering a dangerous condition. It insists that a judicially imposed program for routine inspection of all public property would expand public-entity liability and require unfunded expenditures of government resources in violation of the Tort Claims Act.

## IV.

Potholes and depressions are a common feature of our roadways. However, "not every defect in a highway, even if caused by negligent maintenance, is actionable." *Polyard v. Terry,* 160 *N.J.Super.* 497, 508, 390 *A.*2d 653 (App.Div.1978), *aff'd o.b.,* 79 *N.J.* 547, 401 *A.*2d 532 (1979).

To determine whether the fatal bicycle accident caused by the depression on the shoulder of Parsonage Hill Road is actionable

requires an understanding of both the general purpose of the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, and the particular provision detailing a public entity's liability for a dangerous condition of public property, *N.J.S.A.* 59:4–2. The Tort Claims Act was passed in response to this Court's abrogation of the common-law doctrine of sovereign immunity. *See Willis v. Dept't of Conservation & Econ. Dev.,* 55 *N.J.* 534, 540–41, 264 *A.*2d 34 (1970). The Legislature recognized that "the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done." *N.J.S.A.* 59:1–2. Accordingly, the Legislature confined the scope of a public entity's liability for negligence to the prescriptions in the TCA. *Ibid.*

■ A public entity is only liable for an injury arising "out of an act or omission of the public entity or a public employee or any other person" as provided by the TCA. *N.J.S.A.* 59:2–1(a). In other words, a public entity is "immune from tort liability unless there is a specific statutory provision" that makes it answerable for a negligent act or omission. *Kahrar v. Borough of Wallington,* 171 *N.J.* 3, 10, 791 *A.*2d 197 (2002) (citing *Collins v. Union Cnty. Jail,* 150 *N.J.* 407, 413, 696 *A.*2d 625 (1997)).

The relevant statutory provision here is *N.J.S.A.* 59:4–2, which addresses a dangerous condition of public property. *N.J.S.A.* 59:4–2, in full, provides:

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

b. a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

Unless plaintiff in this case can satisfy the elements of a cause of action set forth in *N.J.S.A.* 59:4–2, he does not have a basis for a recovery. *Vincitore v. N.J. Sports & Exposition Auth.,* 169 *N.J.* 119, 124–25, 777 *A.*2d 9 (2001). On the present record, we accept that Kahn–Polzo's accident was caused by the depression on the shoulder of Parsonage Hill Road. The issue is whether the depression was a "dangerous condition [that] created a reasonably foreseeable risk of the kind of injury which was incurred." *N.J.S.A.* 59:4–2. Only if plaintiff can prove this element do we turn to the next step: whether the public entity—by the act or omission of one of its employees—created the dangerous condition, *N.J.S.A.* 59:4–2(a), or whether the "public entity had actual or constructive notice of the dangerous condition" within "a sufficient time" before the accident that it could "have taken measures to protect against [it]," *N.J.S.A.* 59:4–2(b). Even if plaintiff has met all of these elements, the public entity still will not be liable unless the public entity's failure to protect against the dangerous condition can be deemed "palpably unreasonable." *N.J.S.A.* 59:4–2.

With these principles as a backdrop, we address the issues before us.

## V.

We reject the Appellate Division's conclusion that—based on the summary judgment record—the County "created" the dangerous condition under *N.J.S.A.* 59:4–2(a) by failing to have a routine road inspection program in place. Even if we were to assume that the County had an inadequate inspection program, natural conditions—not a flawed inspection program—"created" the depression on the shoulder of roadway. Indeed, plaintiff's expert, Dr. Kuperstein, opined that underground erosion—not human means—created the depression.

The appellate panel blurred the distinction between *N.J.S.A.* 59:4–2(a), which speaks of a public employee's negligent act or omission that affirmatively creates a dangerous condition, and *N.J.S.A.* 59:4–2(b), which speaks of a public entity that is on

notice of a dangerous condition—either actually or constructively—and fails to protect against it. A dangerous condition of property may be "created" if, for example, a public entity's snow plow creates a pothole or the entity's paving of a roadway is negligently performed. *See, e.g., Tymczyszyn v. Columbus Gardens,* 422 *N.J.Super.* 253, 264, 27 *A.*3d 1253 (App.Div.2011) (alleging that defendant's negligent snow removal created icy condition of sidewalk that caused plaintiff to fall); *Atalese v. Long Beach Twp.,* 365 *N.J.Super.* 1, 5, 837 *A.*2d 1115 (App.Div.2003) (alleging that County created depression in pedestrian-bicycle lane by negligently installing storm sewer extension).

But a public entity does not *create* a dangerous condition merely because it should have discovered and repaired it within a reasonable time before an accident. The fact that the public entity did not create a dangerous condition does not render it unaccountable under the TCA. Public-entity liability may also be based on the entity's actual or constructive notice of a dangerous condition if its failure to protect against the danger is palpably unreasonable.

*N.J.S.A.* 59:4–3 provides:

a. A public entity shall be deemed to have *actual notice* of a dangerous condition within the meaning of subsection b. of section 59:4–2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

b. A public entity shall be deemed to have *constructive notice* of a dangerous condition within the meaning of subsection b. of section 59:4–2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character.

[ (Emphasis added).]

Thus, when a public entity actually knows of a roadway defect and "should have known of its dangerous character," it is on actual notice. *N.J.S.A.* 59:4–3(a). And when a dangerous condition is "obvious" and has existed "for such a period of time" that the public entity should have discovered it through the exercise of reasonable care, the public entity is on constructive notice. *N.J.S.A.* 59:4–3(b). If failing to discover a dangerous defect on

public property were the equivalent of creating the defect, the Legislature would have had no need to provide for liability based on actual or constructive notice. *N.J.S.A.* 59:4–2(a) and (b). Whether a public entity is on actual or constructive notice of a dangerous condition is measured by the standards set forth in *N.J.S.A.* 59:4–3(a) and (b), not by whether "a routine inspection program" by the County—as suggested by plaintiff—would have discovered the condition.

Here, the record reveals that just five weeks before Kahn–Polzo's accident, the County not only inspected all 2.6 miles of Parsonage Hill Road, but filled potholes in the process. Plaintiff's expert never intimated that even an optimal roving pothole patrol—serving as a routine inspection program—would scour the roads for imperfections more than once every five weeks. Certainly, plaintiff's expert has not pointed to any authority or recognized standard that would require as much.

Dr. Kuperstein claims, in his report dated July 29, 2004, that the County did "not have an accepted safe and proper procedure or system with which to identify and repair roadway surface defects" and cites, as support, the "Suggested Pothole Repair Program" in the *Pothole Primer* published by United States Army Corps of Engineers. *Robert A. Eaton, et al., U.S. Army Corps of Engineers, Pothole Primer: A public administrator's guide to understanding and managing the pothole problem* 3 (1989), *available at* http://www.dot.state.il.us/blr/p009.pdf [hereinafter "*Pothole Primer*"]. Among other things, the *Pothole Primer suggests* that public administrators "[t]rain a 'Pothole Supervisor' to recognize problem areas," "[c]onduct an inventory," and "[d]evelop a maintenance schedule." *Id.* at i. However, Dr. Kuperstein did not offer any evidence to indicate that this *suggested* program is an objective standard of practice or has been adopted by other public entities. The *Pothole Primer*, moreover, does not set forth a standard for identifying when a roadway defect is dangerous.[8]

---

[8] Dr. Kuperstein also cites generally to other publications by the American Association of State Highway and Transportation Officials for further support.

Moreover, the County *did* appear to have a proactive program, even if it was less than ideal. The County did more than just respond to pothole complaints received by telephone. The County inspected roads based both on the date of the last overlay and a known history of pavement problems. Additionally, County workers repairing a complained-of pothole would inspect other portions of a roadway for defects and make necessary repairs. Plaintiff's expert has not shown that his conception of a routine road inspection program would have resulted in a more timely review of the roadway than the one done here five weeks before the accident.

■ This Court does not have the authority or expertise to dictate to public entities the ideal form of road inspection program, particularly given the limited resources available to them. *See N.J.S.A.* 59:1–2 (declaring that government's "power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done"). We cannot find that the absence of a more systematic program violates the Tort Claims Act, particularly when plaintiff has not provided this Court with any recognized standard of care that demands otherwise.

Plaintiff has not shown in this case that the absence of a more routine road inspection program is proximately related to the injuries suffered by Kahn–Polzo. Any determination that the County should have discovered and repaired the depression on the shoulder of Parsonage Hill Road for purposes of *N.J.S.A.* 59:4–2 depends on (1) whether the County was on actual or constructive notice of a dangerous condition and, if so, (2) whether its failure to protect against the dangerous condition was palpably unreasonable.

---

After independent review of the two publications listed as examples, *AASHO, An Informational Guide for Physical Maintenance of Pavements* 4 (1963) and *AASHTO, Guidelines of Pavement Management* 4 (1985), we find that they do not indicate an appropriate standard for determining when a roadway defect is dangerous for purposes of the TCA.

We now turn to whether the County was on notice of a dangerous condition on its roadway.

## VI.

Even looking at the evidence, as we must, in the light most favorable to plaintiff, we cannot conclude that the County was on either actual or constructive notice of a dangerous condition on the *shoulder* of Parsonage Hill Road. We accept plaintiff's argument that the nature and scope of the depression was no different on the day of the accident, August 18, 2001, than it was on July 6, 2001, the day a County road crew repaired potholes on Parsonage Hill Road. Thus, the question really boils down to whether the County—five weeks before the accident—should have discovered the two-foot wide depression on the shoulder of the road that reached a maximum depth of one-and-one-half inches and determined that it was a "dangerous condition [that] created a reasonably foreseeable risk of" causing death. *N.J.S.A.* 59:4–2.

## A.

In deciding that question, we begin with some basic principles of law governing our roadways. The "roadway" is "that portion of a highway ... ordinarily used for vehicular travel," whereas the "shoulder" is "that portion of the highway, exclusive of and bordering the roadway, *designed for emergency use* but not ordinarily to be used for vehicular travel." *N.J.S.A.* 39:1–1 (emphasis added); *see also Hochberger v. G.R. Wood, Inc.*, 124 *N.J.L.* 518, 520, 12 *A.*2d 689 (E. & A.1940) ("The shoulder is not designed nor constructed for general traffic uses but is rather for emergency uses such as parking of vehicles disabled or otherwise."); *Sharp v. Cresson*, 63 *N.J.Super.* 215, 221, 164 *A.*2d 503 (App.Div. 1960) ("It is clear that the Legislature did not intend that the shoulder of a road be used for ordinary travel."). A "vehicle" is defined as "every device in, upon or by which a person or property is or may be transported upon a highway, *excepting devices moved by human power* or used exclusively upon stationary rails or

tracks or motorized bicycles." *N.J.S.A.* 39:1–1 (emphasis added). By the Motor Vehicle Code's plain terms, roadways generally are built and maintained for cars, trucks, and motorcycles—not bicycles. Even the *Pothole Primer*—relied on by plaintiff—defines a pothole as a "pavement defect" that will "cause significant noticeable impact on *vehicle* tires and *vehicle* handling." *Pothole Primer, supra,* at 6 (emphasis added).

A bicycle rider on a roadway is vested with all the "rights" and "duties applicable to the driver of a vehicle" under Title 39, chapter four of our Motor Vehicle Code. *N.J.S.A.* 39:4–14.1. Under the Motor Vehicle Code, "[e]very person operating a bicycle upon a roadway [is required to] ride as near to the right side of the roadway as practicable." *N.J.S.A.* 39:4–14.2. Bicyclists do not have special privileges on a roadway's shoulder. Indeed, a bicycle rider is directed to ride on the furthest right hand side of the roadway, not on the roadway's shoulder. The Motor Vehicle Code does not designate the roadway's shoulder as a bicycle lane.[9]

We understand that many bicyclists may be inclined to ride on a roadway's shoulder to stay clear of vehicular traffic and out of concern for their safety. Nevertheless, inherent dangers confront bicyclists who travel on roadways that are not faced by operators of motor vehicles. A tree branch, a stone, and even a pothole or depression might destabilize a bicycle that a car would harmlessly pass over. Public entities do not have the ability or resources to remove all dangers peculiar to bicycles. Roadways cannot possibly be made or maintained completely risk-free for bicyclists.

Roadways generally are intended for and used by operators of vehicles. That is a point addressed by the Illinois Supreme

---

[9] A public entity's designation of a portion of the roadway as a bicycle lane would alter the generally intended use of that part of the road and would require the public entity to maintain it in a reasonably safe manner for those purposes. *See Atalese, supra,* 365 *N.J.Super.* at 6, 837 *A.2d* 1115 (holding that three-quarter inch depression on bicycle/pedestrian lane could be found by jury to be dangerous condition given path's intended uses).

Court in *Boub v. Twp. Of Wayne,* 183 *Ill.*2d 520, 234 *Ill.Dec.* 195, 702 *N.E.*2d 535 (Ill.1998). In that case, the plaintiff sued Wayne Township after he was thrown from his bicycle when the front tire became stuck between two planks on a wooden bridge that was under renovation. *Id.* at 536. The Illinois Tort Immunity Act has a provision similar to *N.J.S.A.* 59:4–2. *Id.* at 537. In affirming the grant of summary judgment in favor of the municipality, the Illinois high court observed that "many road conditions that do not pose hazards to vehicles may represent special dangers to bicycles ... such as potholes, speed bumps, expansion joints, sewer grates, and rocks and gravel, to name but a few." *Id.* at 542–43. The court believed it "appropriate to consider the potentially enormous costs both of imposing liability for road defects that might injure bicycle riders and of upgrading road conditions to meet the special requirements of bicyclists." *Id.* at 543. For purposes of the Illinois Tort Immunity Act, it held that although bicycle riders are permissive users of roadways, those riders should not "be considered intended users." *Ibid.*

Under New Jersey's Tort Claims Act, a " '[d]angerous condition' means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1; *see also Garrison v. Twp. of Middletown,* 154 *N.J.* 282, 291–92, 712 *A.*2d 1101 (1998) (stating that one consideration in determining whether "dangerous condition" exists is " 'whether the property creates a substantial risk of injury *"to persons generally,* who would use the property with due care in a foreseeable manner." ' " (quoting *Daniel v. New Jersey Dep't of Transp.,* 239 *N.J.Super.* 563, 587, 571 *A.*2d 1329, (App.Div.), *certif. denied,* 122 *N.J.* 325, 585 *A.*2d 343 (1990))); *see also Vincitore, supra,* 169 *N.J.* at 126, 777 *A.*2d 9 (2001) (noting that one consideration in deciding whether property is in dangerous condition is if "the property poses a danger to the general public when used in the normal, foreseeable manner").

Having established that the generally intended use of a roadway is for vehicles, we next turn to whether the County road crew fixing potholes on Parsonage Hill Road on July 6, 2001 had actual or constructive notice of a dangerous condition on the shoulder that caused Kahn–Polzo's accident.

## B.

Photographs of the accident scene—the shoulder of Parsonage Hill Road—were taken on August 18, 2001. One photograph shows a ruler in the depression, measuring its depth, and another shows rulers measuring its diameter. Based on that photograph, the County's Assistant Supervisor of Roads, Macaluso, averred that the depression covered a two-foot circular area and was an inch-and-a-quarter in depth. Looking at that same photograph, plaintiff's expert, Dr. Kuperstein, conservatively estimated the depression's depth to be one-and-three-eighths inches, but approximated the depth to be one-and-one-half inches. The trial court reviewing the photographs and other evidence determined that the depression was not of such an obvious nature that it should have been discovered through the exercise of reasonable diligence.

Even assuming that the depth of the depression was one-and-one-half inches at the time the road crew surveyed the entire 2.6 mile length of Parsonage Hill Road five weeks before the accident and that the depression would have been obvious to the naked eye on the roadway's shoulder, still it would not have been obvious to the reasonable observer that the depression presented a dangerous condition as defined in *N.J.S.A.* 59:4–1. Moreover, no one suggests that the road crew was measuring every pothole and depression with a ruler over the entire roadway. Macaluso testified that the County would not repair a pothole or depression of less than one-and-one-half inches in depth because the asphalt would not adhere to it. That Macaluso expressed in a deposition that the depression would have been repaired if the County "had knowledge of it" does not mean that the County was required to

repair the depression or that the depression represented a dangerous condition of property within the meaning of the TCA. Nor does his testimony suggest that a crew surveying the entire length of a 2.6 mile road would have or should have considered a depression barely one-and-one-half inches in depth on the roadway's shoulder as a dangerous condition. Nothing suggests that the crew was looking for an imperfection on the roadway's shoulder that might have destabilized a bicycle.

More importantly, Dr. Kuperstein did not set forth in any of his three expert reports or his deposition testimony any recognized or established standard for determining when a pothole or depression presents a dangerous condition on a roadway when it is used for its generally intended purpose. Dr. Kuperstein has given no foundational basis—from tests in the field to published authority— that a one-and-one-half inch depression on the shoulder of a road, such as Parsonage Hill Road, represents "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *See N.J.S.A.* 59:4-1.

Plaintiff offered no evidence that the shoulder of Parsonage Hill Road was designated as a bicycle lane or routinely used as one. Even if the shoulder of that road was routinely being used as a bicycle lane, no reports of accidents—other than the one here— were recorded as a result of the depression.[10] Assuming that the depression existed for an extensive period of time before the accident, as Dr. Kuperstein has opined, plaintiff has not presented any evidence that a bicycle rider, motorist, or pedestrian complained or was injured as a result of the depression.

The evidence viewed in the light most favorable to plaintiff reveals a failure of proof. The depression, located on the road-

---

[10] We need not address here the standard of care that might apply under the Torts Claims Act if a roadway's shoulder were routinely used as a bicycle lane and the public entity responsible for the maintenance of that roadway was on notice of that use.

way's shoulder, was, at best, just one-and-one-half inches in depth, and the generally intended purpose of a roadway is for vehicular use and the generally intended purpose of the shoulder is for emergency use. Based on these factors, plaintiff cannot show, even under the indulgent summary-judgment standard of review, that the shoulder depression "was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." *See N.J.S.A.* 59:4-3(b).

## VII.

Last, we conclude that even if plaintiff could show that the County was on actual or constructive notice that the depression on the roadway's shoulder was a dangerous condition of property, a reasonable jury could not find that—under the circumstances here—the failure to take action to "protect against" the condition was "palpably unreasonable." *N.J.S.A.* 59:4-2.[11] Thus, the trial court was correct in holding that plaintiff did not establish a jury question concerning whether the County acted in a palpably unreasonable manner.[12]

The term "palpably unreasonable"—as used in *N.J.S.A.* 59:4-2—"implies behavior that is patently unacceptable under any given circumstance." *Muhammad v. N.J. Transit,* 176 *N.J.* 185, 195–96, 821 *A.2d* 1148 (2003) (citing *Kolitch v. Linde-*

---

11 " 'Protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition." *N.J.S.A.* 59:4-1(b).

12 Although ordinarily the question of whether a public entity acted in a palpably unreasonable manner is a matter for the jury, in appropriate circumstances, the issue is ripe for a court to decide on summary judgment. *Maslo v. City of Jersey City,* 346 *N.J.Super.* 346, 350–51, 787 *A.2d* 963 (App.Div.2002); *Black v. Borough of Atl. Highlands,* 263 *N.J.Super.* 445, 451–52, 623 *A.2d* 257 (App.Div.1993); *Wooley v. Bd. of Chosen Freeholders,* 218 *N.J.Super.* 56, 62, 526 *A.2d* 1116 (App.Div.1987); *see also Garrison, supra,* 154 *N.J.* at 311, 712 *A.2d* 1101 (Stein, J., concurring).

*dahl,* 100 *N.J.* 485, 493, 497 *A.2d* 183 (1985)). When a public entity acts in a palpably unreasonable manner, it should be "obvious that no prudent person would approve of its course of action or inaction." *Ibid.* The duty to refrain from palpably unreasonable conduct differs in degree from the ordinary duty of care that is owed under the negligence standard. *Ibid.*

Moreover, the 1972 Task Force Comment on *N.J.S.A.* 59:4–2 is relevant to the concerns raised in this case:

> This section recognizes the difficulties inherent in a public entity's responsibility for maintaining its vast amounts of public property. Thus it is specifically provided that when a public entity exercises or fails to exercise its discretion in determining what action should or should not be taken to protect against the dangerous condition that judgment should only be reversed where it is clear to the court that it was palpably unreasonable. *Bergen v. Koppenal,* 52 *N.J.* 478, 480, 246 *A.2d* 442 (1968). That decision was based on the thesis that a public entity's discretionary decisions to act or not to act in the face of competing demands should generally be free from the second guessing of a coordinate branch of Government.
>
> [Harry A. Margolis and Robert Novack, *Claims against Public Entities,* 1972 Attorney General's Task Force on Sovereign Immunity comment on *N.J.S.A.* 59:4–2 (Gann 2011).]

Justice Stein's concurrence in *Garrison* is helpful in regard to the application of this Comment to the facts before us. In *Garrison,* a boy, just shy of his seventeenth birthday, was injured while playing night touch football on property owned by Middletown Township—a parking lot that had an uneven surface, a declivity of one-and-one-half inches. *Garrison, supra,* 154 *N.J.* at 285, 712 *A.2d* 1101. Plaintiff argued that the declivity posed a substantial risk of injury to a foreseeable user exercising due care. *Id.* at 311, 712 *A.2d* 1101. Apparently, the declivity remained because the Township had suspended a repaving project. *Ibid.*

In his concurrence, Justice Stein accepted those facts, but concluded that "the Township's failure to devote its resources to the completion of repaving or to the amelioration of the declivity cannot be deemed palpably unreasonable." [13] *Ibid.* He observed

---

[13] The majority determined that the parking lot "was not dangerous for anyone who used it 'with due care.'" *Garrison, supra,* 154 *N.J.* at 293, 712 *A.2d* 1101.

that it was reasonable to infer that the declivity could be viewed as a maintenance item of low priority. *Ibid.* He further observed that "[h]ad the Township received prior complaints or reports of prior injuries with regard to the alleged dangerous condition, the issue might be viewed differently," but that there was "no evidence of prior injuries or complaints." *Ibid.*

Essex County is responsible for maintaining an extensive network of roads, including 2.6 miles on Parsonage Hill Road. There were no prior complaints or reports of injuries from the depression on the roadway's shoulder. The shoulder of a roadway is generally intended for emergency use, not ordinary travel. Because the roadway is "that portion of a highway . . . ordinarily used for vehicular travel," *N.J.S.A.* 39:1–1, a public entity—in choosing when and what repairs are necessary—might reasonably give lesser priority to the shoulder. *See generally U.S. Department of Transportation, Federal Highway Administration, Materials and Procedures for Repair of Potholes in Asphalt–Surfaced Pavements, Manual of Practice* 3 (1999), *available at* http://www.fhwa.dot.gov/publications/research/infrastructure/pavements/ltpp/99168/99168.pdf (noting that decision to repair particular pothole depends on multiple factors, such as "[t]he level of traffic[;] [t]he time until scheduled rehabilitation or overlay[;] [t]he availability of personnel, equipment, and materials[; and] [t]he tolerance of the traveling public").[14] It is fair to say that in view of the County's considerable responsibility for road maintenance in a world of limited public resources, the depression here, barely one-and-one-half inches in depth on the roadway's shoulder, might not have

---

The majority concluded that "[t]ouch football on a poorly-lit uneven railroad-station parking lot constitutes a use of public property that is as a matter of law 'without due care.' " *Ibid.*

[14] *Cf. N.J.S.A.* 59:2–3(d) ("A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless . . . the determination of the public entity was palpably unreasonable.").

been deemed a high priority, even if the County were on notice of its presence.

All in all, even when the issue is viewed favorably to plaintiff, we cannot conclude that the County acted in a palpably unreasonable manner by failing to "protect against" the depression before the tragic accident in this case.

## VII.

For the reasons expressed, we reverse the Appellate Division and reinstate the trial court order granting summary judgment and dismissing plaintiff's complaint.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, ALBIN, HOENS and PATTERSON—5.

*Not participating*—Justice LaVECCHIA and Judge WEFING (temporarily assigned)—2.