**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2374-19

GARY McNICHOL,

     Plaintiff-Appellant,

v.

ROUTE ONE CORP., d/b/a
SANSONE AUTO MALL,
a/k/a GENERAL TOYOTA, INC.,
SANSONE KIA, DAVID
SALSIDO, as agent/servant/
employee of ROUTE ONE CORP.,
d/b/a SANSONE AUTO MALL,
a/k/a GENERAL TOYOTA, INC.,
SANSONE KIA, and DAVID
SALSIDO, individually,

     Defendants-Respondents.

_____

Argued June 8, 2021 – Decided June 24, 2021

Before Judges Yannotti, Haas, and Natali.

On appeal from the Superior Court of New Jersey, Law
Division, Monmouth County, Docket No. L-4514-17.

Mariesa C. Iulo argued the cause for appellant (Law Offices of Kenneth D. Iulo, attorney; Mariesa C. Iulo, on the brief).

Joseph C. DeBlasio argued the cause for respondents (Jackson Lewis, PC, attorneys; Joseph C. DeBlasio and R. Shane Kagan, of counsel and on the brief).

PER CURIAM

Plaintiff Gary McNichol appeals from the Law Division's January 10, 2020 order granting summary judgment and dismissing his claim of wrongful termination based upon disability discrimination in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -59, against defendants Route One Corporation, d/b/a Sansone Auto Mall (Sansone) and its vice-president, David Salsido (collectively defendants). We affirm.

We derive the following material facts from the evidence submitted by the parties in support of, and in opposition to, defendants' summary judgment motion, viewed in a light most favorable to plaintiff, the non-moving party. Polzo v. Cnty. of Essex, 209 N.J. 51, 56 n.1 (2012) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

Sansone operates three retail car dealerships: Route One Toyota, Route One Hyundai, and Route One Kia. In March 2011, Sansone hired plaintiff as a sales manager at the Toyota dealership. As a manager, plaintiff's compensation

A-2374-19

was based solely on the commissions he earned from selling vehicles. Like other similarly-situated employees, plaintiff received a weekly advance on these commissions, which was referred to as his "draw." When plaintiff's draws in any given month exceeded the amount of commissions he actually earned, he was responsible for the shortfall, either by paying Sansone back the difference or by deductions taken from his future commissions. In his deposition, plaintiff testified this arrangement was standard practice in the industry and that it would be fair to terminate an employee who had a consistent shortfall.

When he began working at the Toyota dealership, plaintiff's draw was $2000 per week. At the end of 2011, plaintiff transferred to the Hyundai dealership, where he received an increased weekly draw of $2200. His new title was assistant sales manager.

By January 2014, plaintiff owed Sansone $6095.95 in unearned draws. Sansone agreed to allow plaintiff to pay it $500 per month until he was able to reduce the balance due to $2000. At that point, Sansone "wrote off" plaintiff's remaining debt.

In March 2015, plaintiff asked Salsido to increase his weekly draw to $2800. Plaintiff told Salsido he had received a job offer from another dealership that was closer to his home and could only stay if Sansone increased his draw.

A-2374-19

Salsido agreed to this request, and plaintiff's draw was now the highest in the company.

However, plaintiff was unable to earn sufficient commissions to cover the amount of his new weekly draw. Within two months, plaintiff already owed Sansone $14,530.68. By June 2015, plaintiff's debt had increased to $24,278.80.

In an attempt to help plaintiff meet his financial obligations, Sansone increased plaintiff's commission rate from 4.0% to 5.5%. However, plaintiff still owed Sansone $22,661.62 in unearned draws at the end of 2015. Nevertheless, Sansone again wrote off this debt, and plaintiff began 2016 with a clean slate.

By April 2016, plaintiff was almost $9000 in arrears. On May 1, 2016, Sansone transferred plaintiff back to the Toyota dealership. Plaintiff had no objection to this transfer so long as his weekly draw remained at $2800. Sansone also wrote off $2500 of plaintiff's 2016 shortfall.

On June 17, 2016, plaintiff was involved in a car accident and sustained injuries to his left shoulder, spine, and one of his ribs. He continued to work following the accident.

In late July or early August 2016, plaintiff asked for a transfer to the Kia dealership, where he could work with his prior finance manager. Sansone

4

granted plaintiff's request even though there were already two other sales managers at this dealership.

Over the next two months, the sales at the Kia dealership fell and, in August 2016, only thirty-five vehicles were sold. By the end of September, plaintiff's unearned draws again totaled nearly $9000, and only thirty-seven vehicles were sold that month. In his testimony, plaintiff agreed that his performance demonstrated "a continuing pattern of shortfalls."

Salsido testified during his deposition that on October 14, 2016, he decided to terminate plaintiff's employment. Salsido explained that the Kia dealership could not support three sales managers, all three of whom were taking a percentage commission on each vehicle sold. Salsido chose plaintiff for termination based upon his consistently poor performance over the prior two years, which placed an additional financial burden on the company due to his unearned draws.

Salsido informed Sansone's president of this decision, as well as plaintiff's immediate supervisor. Both agreed that Salsido should fire plaintiff as soon as plaintiff returned from a pre-scheduled one-week vacation that began on October 17, 2016.

A-2374-19

Although plaintiff was not due to return from his vacation until October 24, Salsido learned that plaintiff would be coming to work on October 21. He planned to meet with plaintiff that day to tell him that his employment would be terminated.

However, when plaintiff came to the dealership, he immediately went to see Sansone's human resources director (the director), and told her that he needed to take two or three weeks off from work because he was going to have shoulder surgery on October 24. This was the first the director had heard of the surgery, and Salsido also had no prior knowledge of it. The director also did not know that Salsido was waiting to meet with plaintiff so he could terminate his employment.

The director gave plaintiff the required paperwork to apply for a disability leave, and plaintiff left the building. Around this time, Salsido learned that plaintiff was at the dealership and went to speak to him. However, by the time Salsido got to the director's office, plaintiff was already gone. Salsido then called plaintiff's cell phone and let him know that he was being fired.

Plaintiff subsequently filed a three-count complaint against Sansone and Salsido. Count one involved his LAD claim for wrongful discharge based on

6

his disability.[1]  Plaintiff alleged that he was discharged because he sought a medical leave of absence.  At his deposition, however, plaintiff admitted he did not know the reason he was fired.

After plaintiff's termination, Sansone did not hire anyone to replace him as a sales manager at the Kia dealership.  Sales at that dealership began to dramatically improve in November 2016, the month after plaintiff was fired, even though there were now only two sales managers.

After the completion of discovery, defendants moved for summary judgment and plaintiff opposed the motion.  Following oral argument, the trial judge found that plaintiff did not establish a prima facie case of wrongful termination based on disability discrimination.  The judge further found that even if plaintiff were able to establish a prima facie case, he had not produced any evidence to rebut defendants' articulated nondiscriminatory reasons for his termination.  This appeal followed.

On appeal, plaintiff asserts that he established a prima facie case of disability discrimination and that defendants' reasons for terminating him were a pretext for unlawful discrimination.  We disagree.

---

[1]  At oral argument on defendants' summary judgment motion, plaintiff voluntarily dismissed the remaining two counts of his complaint.

Our review of a trial court's grant of summary judgment is de novo, applying the same legal standard as the trial court. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat, 217 N.J. at 38); see also R. 4:46-2(c).

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande, 230 N.J. at 24 (quoting Bhagat, 217 N.J. at 38). We owe no special deference to the motion judge's legal analysis. RSI Bank, 234 N.J. at 472 (quoting Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 214 N.J. 189, 199 (2016)).

The LAD prohibits employment discrimination based on an employee's disability. In pertinent part, N.J.S.A. 10:5-12(a) provides:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an

employer, because of the . . . disability . . . of any individual . . . to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

"All LAD claims are evaluated in accordance with the United States Supreme Court's burden shifting" methodology established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013). A plaintiff claiming disability discrimination must first present evidence establishing a prima facie case of the alleged discriminatory conduct. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005).

To successfully assert a prima facie claim of discriminatory discharge based on disability, a plaintiff must prove that he:

> (1) belongs to a protected class; (2) applied for or held a position for which he . . . was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person. The establishment of a prima facie case gives rise to a presumption of discrimination.
>
> [Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-14 (2002).]

If a plaintiff establishes a prima facie case, creating an inference of discrimination, the burden of production then shifts to the defendant to

9

"articulate a legitimate, nondiscriminatory reason for the employer's action." Zive, 182 N.J. at 449 (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596 (1988)). Where the defendant does so, "the burden of production shifts back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision." Ibid.

"To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." Ibid. (citing Viscik, 173 N.J. at 14). At all times, however, the burden of persuasion that the employer engaged in intentional discrimination remains with the employee. Clowes, 109 N.J. at 596.

The employer is entitled to summary judgment if, after proffering a nondiscriminatory reason for its decision, plaintiff cannot "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Zive, 182 N.J. at 455-56 (quoting Fuentes v. Perskie, 32 F.3d 759, 769 (3d Cir. 1994)).

Applying these standards, and considering the facts in the light most favorable to plaintiff, we are satisfied that the trial judge properly granted summary judgment to defendants. Therefore, we affirm the judge's determination and add the following brief comments.

Defendants concede on appeal that plaintiff presented sufficient evidence to establish the first three prongs of a prima facie case of disability discrimination. Plaintiff needed to be absent from work for two or three weeks because he was going to undergo shoulder surgery. This appears to be sufficient to place him in a class protected by the LAD under the first part of the Viscik test. Although defendant was certainly performing poorly as a sales manager, he apparently met the basic requirements for the position, thereby satisfying the second prong. The employer terminated plaintiff's employment and, therefore, the third factor of the test was also met.

However, defendants never sought to replace plaintiff after his termination and the sales manager position remained unfilled throughout the litigation. Accordingly, plaintiff did not satisfy the fourth prong of the Viscik test. Because plaintiff was unable to establish a prima facie case of employment discrimination, the judge properly granted defendants' motion for summary judgment.

A-2374-19

However, even if we assume that plaintiff succeeded in establishing his prima facie case, defendants articulated valid, nondiscriminatory reasons for the decision to fire plaintiff. See Zive, 182 N.J. at 449 (citing Clowes, 109 N.J. at 596). Plaintiff's work performance had been getting progressively worse since 2014. He was consistently overdrawn on his commissions and Sansone ultimately had to "write off" over $25,000 of plaintiff's debt.

Although Sansone increased plaintiff's commission rate and transferred plaintiff to his preferred dealership, he continued to chronically underperform. When the Kia dealership suffered through two dreadfully unsuccessful months in August and September 2016 under plaintiff's management, Salsido decided it was time to terminate him.

Having articulated its nondiscriminatory motive for termination, the burden shifted back to plaintiff to prove by a preponderance of the evidence that defendants' stated reasons were merely pretext for their true discriminatory intent. Plaintiff failed to meet this burden. He did not point to any evidence in the record that could plausibly lead to an inference of disability discrimination. Indeed, plaintiff admitted he did not know the reason for his termination.

Moreover, nothing in the record indicates that Salsido was even aware that plaintiff had asked for time off to undergo surgery when he fired him. Plaintiff

12

worked at the Kia dealership following his car accident, and was only going to be absent from work for two to three weeks. Plaintiff did not even raise the issue of his alleged disability until after he was terminated.

Under these undisputed facts, we are satisfied that no reasonable jury could conclude that defendants' actions to terminate an unproductive employee were a pretext for disability discrimination. We therefore affirm the trial judge's summary judgment order.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2374-19