NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2005-21

ESTATE OF WILLIAM MASSI
and DENISE MASSI, his wife,

      Plaintiffs-Appellants/Cross-
Respondents,

v.

BETTE BARR, BARRY BARR,
PUBLIC SERVICE ELECTRIC
& GAS COMPANY, and
CENTER STATE ENGINEERING
ASSOCIATES, INC.,

      Defendants,

and

TOWNSHIP OF MONROE and
TOWNSHIP OF CRANBURY,

      Defendants-Respondents/
Cross-Appellants,

and

ALLSTATE INSURANCE
COMPANY,

      Defendant-Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| AS REDACTED |
| **June 28, 2024** |
| APPELLATE DIVISION |

Argued January 29, 2024 – Decided June 28, 2024

Before Judges Sabatino, Chase, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5579-18.

Abraham N. Milgraum argued the cause for appellants/cross-respondents (Blume, Forte, Fried, Zerres & Molinari, attorneys; Abraham N. Milgraum, on the briefs).

Brian A. Bontempo argued the cause for respondent/cross-appellant Township of Cranbury (James P. Nolan and Associates, LLC, attorneys; Brian A. Bontempo, on the briefs).

Sarah E. Fitzpatrick argued the cause for respondent/cross-appellant Township of Monroe (Schaffer Shain Jalloh PC, attorneys; Gregory B. Pasquale, of counsel and on the briefs; Sarah E. Fitzpatrick and May H. Wedlund, on the briefs).

Frederic J. Regenye argued the cause for respondent Allstate Insurance Co. (Regenye Lipstein, LLC, attorneys; Frederic J. Regenye, of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

Bicycle riding has become increasingly prevalent on our public roadways. That increased usage has heightened safety concerns about the condition of roadway surfaces used by bicyclists as well as motor vehicles. Since the 1990s,

the New Jersey Department of Transportation ("DOT") has published guidelines for the safe condition of road surfaces used by both bicycles and motor vehicles.[1]

This Tort Claims Act case arises from a now-deceased plaintiff's bicycle accident on a two-lane public road that straddled two municipalities. The accident occurred on a stretch of the road that was chronically pitted with potholes, apparently due to drainage and freezing problems. According to the deposition testimony of a local public safety director, potholes at that location had to be patched and re-patched "hundreds" of times in the five years before the accident. Several citizens periodically reported the road's poor condition before the accident. The road had no full-sized shoulders or designated bike lanes.

Plaintiff swerved his bicycle to avoid a passing truck, and lost control and fell when his tires hit the potholes. Plaintiff's engineering expert opined that incorrect methods had been used to patch the road. The expert further opined that the persisting uneven surfaces were dangerous, not only for bicycles but also for motorcycles.

---

[1] See N.J. Dep't of Transp., Bicycle Compatible Roadways and Bikeways 61 (1996). We discuss these guidelines in detail within this opinion.

This opinion clarifies and extends the principles of Polzo v. County of Essex ("Polzo I"), 196 N.J. 569 (2008) and Polzo v. County of Essex ("Polzo II"), 209 N.J. 51 (2012) concerning roadway surface conditions that endanger the safety of bicyclists on public roads. In a fact pattern involving a bicycle accident on a road's potholed shoulder, the Court held in Polzo II that the public entity defendant had no duty to maintain the shoulder to an extent safe for bicyclists. Id. at 70-75. The Court distinguished that no-duty-to-bicyclists situation from a roadway condition that also happens to be unsafe for motorized vehicles. Ibid.

We apply the rationale of Polzo II here to this bicycle accident that occurred in a vehicular lane, and to a record with an unrebutted expert opinion that the road surface was unsafe for both bicycles and also motorcycles. We conclude a public entity that is palpably unreasonable in failing to correct such a known dangerous road condition may be liable to a bicyclist who is injured because of that danger. In doing so, we also recognize that a plaintiff operating a two-wheeled vehicle must use due care when confronting a visibly hazardous, potholed surface.

Viewing this record in a light most favorable to plaintiffs, we vacate summary judgment in favor of the two municipal defendants that maintained and

4                                                              A-2005-21

patched the road. We remand for further proceedings, vesting the trial court with discretion to permit further discovery and motion practice focused on the legal principles we have clarified today.

In the unpublished portion of this opinion, we address other discrete matters, including, among other things, issues of notice, causation, control, and insurance coverage.

I.

The Accident

On April 27, 2017, plaintiff William Massi[2] was riding his bicycle alone in the southbound travel lane of Wyckoff Mills Road. The road is on the border between defendants Monroe Township and Cranbury Township, with the road's center line dividing the two townships. As we noted above, the road has no full-sized shoulder and no designated bike lane. Signage identifies a bike path in the area, but plaintiff was unaware of that path.

Photos and testimony in the record show that the stretch of the road between Halsey Reed Road and Brick Yard Road has had many persisting and

---

[2] Massi died in 2023 while this appeal was pending, although there is no claim his death was caused by the bicycle accident. His estate has been substituted into this case. Massi's spouse, Denise Massi, is a co-plaintiff in this case on a per quod claim. For simplicity, we use the term "plaintiff" to refer to William Massi, unless the context suggests otherwise.

A-2005-21

large potholes. In a deposition, plaintiff testified he was an experienced cyclist and had biked on this road at least twenty times in the past. He noticed on previous occasions that there were rough patches and areas of potholes on the stretch of road between Halsey Reed Road and Brick Yard Road, but he had not complained about this to Monroe or Cranbury. Plaintiff said he generally avoided uneven pavement by checking for cars and then moving left onto a smoother area in the middle of the travel lane. He did so on April 27, and continued riding at a speed of about fifteen miles per hour.

According to the lengthy report of plaintiff's expert engineer, Dr. Wayne Nolte, the potholes stem from the construction of a gas main by the Public Service Enterprise Group, Inc. ("PSEG") in 2006. Dr. Nolte opined that the road was not properly repaired after the gas main was installed. Water repeatedly seeped in below the asphalt and, when it froze and refroze, it produced cracks that created many uneven surfaces and potholes.

Cranbury's Director of Public Works, Jerry Thorne, estimated at his deposition that repair crews from his town had patched potholes in this portion of the road "a couple hundred times" in the five years before plaintiff's accident. In addition, maintenance records show that Monroe also had repaired the road about seven times in the six months before the accident.

A-2005-21

Nolte opined that the repairs should have used a "hot patch" rather than a "cold patch" method, citing to standards within a publication from the Asphalt Institute. Defendants contend, however, that during the time period at issue, hot patch ingredients were unavailable in the market.

Both townships had received numerous complaints about this road's potholes before the accident. However, there were no records of previous accidents at that location.

Plaintiff's accident occurred when he was bicycling in the middle of the road to avoid passing over potholes and uneven surfaces. A pickup truck driven by codefendant Barry Barr approached plaintiff from behind. With his wife Bette[3] in the front passenger seat, Barr spotted plaintiff ahead of him and lowered his speed to follow "at a safe/far distance."

Barr testified at his deposition that he did not honk his horn or otherwise attempt to alert plaintiff to the truck's presence, and just assumed plaintiff heard him coming. After following plaintiff for a moment, Barr decided to pass him on the left by moving into the northbound lane of the road "as far left as [his truck] could go" and at an estimated speed of fifteen miles per hour.

---

[3] We will refer to Ms. Barr by her first name, to distinguish her from Barry Barr. No disrespect is intended.

A-2005-21

Plaintiff and the Barrs agree that Barr's truck never struck plaintiff or his bicycle as it passed. Nevertheless, plaintiff was startled by the appearance of the truck next to him and swerved to the right to avoid it. This motion put him on a rough, potholed patch of the road, which made his handlebars vibrate and caused him to lose control of his bicycle and fall.

After Barr pulled ahead of plaintiff, he moved his vehicle back to the right-hand lane. Barr checked his rear mirror and did not see plaintiff anymore but saw "an object on the roadway." When Bette turned around to look, she saw plaintiff on the ground and told Barr. Barr pulled the truck over, and Bette got out and approached plaintiff. Bette called 9-1-1 and then used plaintiff's phone to help him call his wife.

Monroe Police and Emergency Medical Services ("EMS") responded to the scene. An EMS report stated that plaintiff had an abrasion on his neck and reported numbness, tingling, and an inability to move his arms and legs. Plaintiff was taken to a local hospital.

Plaintiff, who was then sixty-five years old, sustained serious injuries because of his fall and required emergency spinal surgery and extensive post-operative physical therapy. He testified that he initially remained mostly paralyzed in his limbs and would faint if he tried to stand or sit upright. As of

8

the time of his deposition in December 2019, plaintiff still required a walker or cane, could not drive or bathe himself, needed special eating utensils, and felt a "tingling numb" sensation in his hands "all the time."

In an expert medical report dated April 12, 2019, the surgeon opined that plaintiff would suffer from "central cord syndrome," manifesting through pain, impairment of movement, and loss of full sensation in his arms, hands, and legs, "for the remainder of his life."

<u>The Tort Claims Notices and This TCA Lawsuit</u>

After serving a tort claims notice on Monroe, and then amending it to correct certain facts, plaintiffs filed this personal injury lawsuit—initially against Barr and Monroe—in the Law Division. Plaintiffs invoked the Tort Claims Act ("TCA"), N.J.S.A. 59:1-1 to :12-3, alleging that Monroe's poor maintenance of the roadway created a dangerous condition that was a proximate cause of the accident.

During motion practice, plaintiffs allegedly learned for the first time that the accident happened on the Cranbury side of Wyckoff Mills Road. Consequently, plaintiffs served a delayed tort claims notice on Cranbury and then added Cranbury as a codefendant.

A-2005-21

Plaintiffs settled with Barr for Barr's insurance policy limits and served a Longworth[4] subrogation letter on their own auto insurer, Allstate Insurance Co. ("Allstate"). Plaintiffs sought underinsured motorist ("UIM") benefits through their Allstate policy. After their lawyers interacted with Allstate's adjusters for about four years, Allstate invoked a "step-down" provision within the policy, contending that it drops UIM coverage down to the mandatory minimum of $15,000 because plaintiff was not a passenger in a motor vehicle or a person getting in or out of one.

After a series of rulings by a succession of assigned Law Division judges, the trial court ultimately granted summary judgment to both townships and, on the coverage issues, to Allstate.

This Appeal and Cross-Appeals

In this appeal, plaintiffs challenge the grant of summary judgment to Monroe and Cranbury on the merits, arguing that the trial court erred by finding that the road was not dangerous to expected users and that the townships' actions in repeatedly fixing potholes at the site were not "palpably unreasonable."

_____

[4] Longworth v. Van Houten, 223 N.J. Super. 174 (App. Div. 1988). The letter gives an insurer notice of its right to intervene in the underlying case before a plaintiff settles with a third party.

Plaintiffs also challenge the grant of summary judgment to defendant Allstate, asserting that the court erred by finding that Allstate appropriately denied coverage for any part of Massi's damages by applying a step-down provision in his UIM policy.

Monroe and Cranbury cross-appeal from the denial of earlier motions to dismiss and for summary judgment. Monroe argues the court should have dismissed the claims against it, based on an inaccuracy in plaintiffs' notice of claim or on the fact that Massi's fall occurred on the side of the road owned by Cranbury. Cranbury argues that dismissal should have been granted on the ground that plaintiffs did not submit a notice of claim upon it within the deadline set by the TCA.

## II.

## A.

We begin the published portion of our analysis by reviewing the trial court's grant of summary judgment to the defendant townships on the substance of plaintiffs' negligence claims against them under the TCA. In doing so, we adhere to familiar standards for summary judgment motions. A court must view the motion record in a light most favorable to the non-moving party, here plaintiffs. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995);

11

see also R. 4:46-1 to -6.  On appeal we apply the same perspective.  Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 124-25 (2023).  We review a grant of summary judgment de novo.  Ibid.

A fundamental premise of the motion judge's reasoning was that the townships owed no duty to plaintiff, as a bicyclist traveling on the paved non-shoulder portion of a public roadway, to assure the road surface was reasonably safe for travel by bicyclists.  Before examining that premise in depth, we briefly summarize various core principles under the TCA.

General Policy of the TCA

"The Legislature passed the TCA after this Court abolished the common law doctrine of sovereign immunity . . . ."  Stewart v. N.J. Tpk. Auth., 249 N.J. 642, 655 (2022) (citing Vincitore ex rel. Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 124 (2001)).  "In doing so, the Legislature provided that public entities could only be held liable for negligence 'within the limitations of [the TCA].'"  Ibid. (alteration in original) (quoting N.J.S.A. 59:1-2).  "[T]he 'guiding principle' of the [TCA] is 'that "immunity from tort liability is the general rule and liability is the exception."'"  D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013) (quoting Coyne v. State Dep't of Transp., 182

N.J. 481, 488 (2005) (quoting Garrison v. Twp. of Middletown, 154 N.J. 282, 286 (1998))).

"Dangerous Condition" Liability

Subject to the terms of the TCA, a public entity may be liable for a personal injury caused by the "dangerous condition" of its public property. N.J.S.A. 59:4-2. The applicable standards for dangerous condition liability under the TCA are well established. To recover for an injury under the general liability section of the TCA, N.J.S.A. 59:4-2, a plaintiff must prove several elements. As the statute prescribes:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under [N.J.S.A.] 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

[N.J.S.A. 59:4-2.]

The TCA defines a dangerous condition of property as a condition that "creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a). A "substantial risk" is "one that is not minor, trivial or insignificant." Kolitch v. Lindedahl, 100 N.J. 485, 493 (1985) (quoting Polyard v. Terry, 160 N.J. Super. 497, 509 (App. Div. 1978)).

The "used with due care" portion of the TCA's definition of a dangerous condition "requires analysis of the 'objectively reasonable' conduct of those who use the property." Vincitore, 169 N.J. at 125 (quoting Garrison, 154 N.J. at 291). The phrase "refers not to the conduct of the injured party, but to the objectively reasonable use by the public generally." Garrison, 154 N.J. at 291. The standard is "whether the property poses a danger to the general public when used in the normal, foreseeable manner." Vincitore, 169 N.J. at 126.

For example, in Atalese v. Long Beach Township, 365 N.J. Super. 1, 3-6 (App. Div. 2003), we concluded that a block-long, three-quarter-inch-deep

differential in the pavement of a designated pedestrian and bicycle lane on a road "could be accepted by a jury as . . . a dangerous condition" since the plaintiff, who tripped into the depression while walking, was an expected user of the lane and was proceeding in an otherwise normal, safe manner when a vehicle approached and prompted her to move sideways.

If it can be shown that public property is safe unless foreseeable users fail to exercise due care, there is no dangerous condition for purposes of the TCA. Garrison, 154 N.J. at 290. Further, where the "physical characteristics" of the property themselves would reasonably notify prospective users that their proposed activity will be hazardous, then the plaintiff's engagement in that activity is not an exercise of due care under N.J.S.A. 59:4-1 and -2. Ibid. (quoting Fredette v. City of Long Beach, 231 Cal. Rptr. 598, 603 (Ct. App. 1986)). "[N]o member of the public may ignore the notice which the condition itself provides." Ibid. (quoting Fredette, 231 Cal. Rptr. at 603). Nevertheless, a plaintiff may still establish that the property was in a dangerous condition through evidence that it "pose[d] a danger to all users," even those who act with appropriate care. Id. at 292.

"Whether property is in a 'dangerous condition' is generally a question for the finder of fact." Vincitore, 169 N.J. at 123. Even so, "like any other fact

question before a jury, [that determination] is subject to the court's assessment whether it can reasonably be made under the evidence presented." Black v. Borough of Atl. Highlands, 263 N.J. Super. 445, 452 (App. Div. 1993). When deciding a motion to dismiss or for summary judgment in a case where the plaintiff has alleged a dangerous condition of a roadway, the judge must examine the issue "pragmatically" to determine whether the particular irregularities complained of "were such that reasonable minds could differ as to whether they manifested that the [roadway] was in a dangerous condition." Polyard, 160 N.J. Super. at 510. If the evidence is inadequate to meet that standard, the motion should be granted. Ibid.

Actual or Constructive Notice

A personal injury claimant also must prove under Section 4-2 of the TCA that the public entity had actual or constructive notice of the dangerous condition. The plaintiff must demonstrate in this respect:

> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. [the] public entity had actual or constructive notice of the dangerous condition under [N.J.S.A.] 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> [N.J.S.A. 59:4-2.]

16

Actual notice is proven if the public entity had "actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a). Alternatively, constructive notice is satisfied if the plaintiff shows "the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." N.J.S.A. 59:4-3(b). See, e.g., Chatman v. Hall, 128 N.J. 394, 418 (1992) (explaining that the length of time a pothole existed, along with its alleged size, could support a reasonable inference that the defendant had either actual or constructive notice).

Evidence that previous complaints have been made about a particular problem on public land, or that there have been other accidents in the same area due to the same cause, may help to establish actual or constructive notice of that dangerous condition. Schwartz v. Jordan, 337 N.J. Super. 550, 565 (App. Div. 2001). In Schwartz, for example, there had been three previous accidents involving pedestrians on a poorly lit stretch of highway, and the township that owned it had received many complaints about the hazardous crosswalks. Id. at 555-56. Given those facts, we concluded the township "long had notice" of the dangerous condition of the roadway. Id. at 565.

"Palpably Unreasonable"

Another requirement of dangerous condition liability under the TCA is that a plaintiff must prove that the public entity's failure to protect against the danger was "palpably unreasonable." N.J.S.A. 59:4-2. The term "palpably unreasonable" is not defined in the Act. The Supreme Court has explained "the term implies behavior that is patently unacceptable under any given circumstance." Kolitch, 100 N.J. at 493. "[I]t must be manifest and obvious that no prudent person would approve of [the public entity's] course of action or inaction." Ibid. (quoting Polyard, 160 N.J. Super. at 216); see also Gonzalez by Gonzalez v. City of Jersey City, 247 N.J. 551, 576 (2021).

The burden of proving a public entity defendant acted in a palpably unreasonable manner is on the plaintiff. Coyne, 182 N.J. at 493. The palpable unreasonableness of an entity's conduct is ordinarily a fact question for the jury. Vincitore, 169 N.J. at 130. But in "appropriate circumstances," the question may be decided by the court as a matter of law, upon an application for summary judgment. Polzo II, 209 N.J. at 75 n.12.

B.

Potholes and Other Road Surface Irregularities

The present case arises out of a claim that a road surface was dangerous because of potholes and other irregularities. In the context of potholes, "not every defect in a highway, even if caused by negligent maintenance, is actionable." Polyard, 160 N.J. Super. at 508. "Travelers on highways must expect some declivities and some areas of imperfect surfaces." Id. at 509. Thus, evidence that a car traveling on a road "might be unstable momentarily by reason of the condition of the highway" or that drivers may "experience[] a dipping or bumping sensation" may be insufficient, particularly if the same evidence demonstrates that cars "were able to maintain their position" on the road nevertheless. Ibid.

Polzo I and II: A Bicycle Accident on a Road's Shoulder

The Supreme Court's two successive opinions in Polzo are especially relevant to the TCA liability analysis here because Polzo also involved a bicycle accident on a public roadway, albeit on the shoulder of that roadway. 196 N.J. at 574-76. The plaintiff in Polzo was injured in an eventually fatal bicycle accident, in which she fell after riding over a two-foot-wide and one-inch-deep "depression or declivity in the shoulder of [a] roadway" owned by Essex County,

a public entity. Ibid. (emphasis added). The record showed the county "had examined and repaired potholes and depressions/declivities along the roadway," but did not establish that it had "identified or repaired" the specific depression at issue on the shoulder. Id. at 580. The Court noted there was no conclusive evidence that the county had ever made repairs to any part of the road's shoulder in the past. Ibid.

In support of a claim that the county had constructive notice of the depression, the plaintiff in Polzo—the bicyclist's widower—submitted "only" an expert engineering report, which the Court found insufficient to demonstrate that the issue was so obvious and had been present for a sufficient length of time that the county should have discovered and repaired it. Id. at 581. Yet, because the trial court had not fully addressed the element of notice to the county, the Court in Polzo I remanded the matter to the Law Division "for its consideration of that issue." Id. at 586.

On remand, the trial court again granted summary judgment to the county, and this court again reversed. Polzo II, 209 N.J. at 56. The Supreme Court granted further review in Polzo II and concluded this court had erred by finding that the county had created a dangerous condition on the shoulder of its roadway "by failing to have a routine road inspection program in place." Id. at 66. The

Court noted that repairs were made to county roads generally "when complaints were received from the police, town officials and residents, and motorists," and that a pothole on the road in question had been repaired just five weeks before the victim's accident. Id. at 58-59. County workers repairing any complained-of defect would also "inspect other portions of a roadway" nearby and make any further repairs needed. Id. at 69.

The Court observed in Polzo II that it "[did] not have the authority or expertise to dictate to public entities the ideal form of road inspection program, particularly given the limited resources available to them." Ibid. It then found that "the absence of a more systematic program" of inspection and repairs by the county did not violate the TCA, "particularly when [the] plaintiff [had] not provided . . . any recognized standard of care that demands otherwise." Ibid.

The Court further considered in Polzo II whether, despite not "creating" a dangerous condition, the county was instead on notice of such a condition such that liability under the TCA could attach. Id. at 70. It began by stating that as defined in N.J.S.A. 39:1-1, a "'roadway' is 'that portion of a highway . . . ordinarily used for vehicular travel,'" and a "'vehicle' is defined as 'every device in, upon or by which a person or property is or may be transported on a highway, excepting devices moved by human power or used exclusively upon stationary

21

rails or tracks or motorized bicycles.'" Ibid. (emphasis added). The Court commented that "roadways generally are built and maintained for cars, trucks, and motorcycles—not bicycles." Id. at 71. It went on to find that "[p]ublic entities do not have the ability or resources to remove all dangers peculiar to bicycles" and are thus not required to make all of the roadways for which they are responsible "completely risk-free for bicyclists." Ibid.

There was no evidence that the shoulder of the road in question in Polzo II was designated as a bicycle lane, and that even if it was routinely being used as one, there were no reports of other accidents caused by or complaints about the specific depression that caused the victim's accident. Id. at 74. The Court thus concluded that the plaintiff had not and could not show that the depression was "of such an obvious nature" or existed for a sufficient period that the county could be charged with constructive notice. Id. at 74-75.

Finally, the Court found that a reasonable trier of fact could not conclude that the county acted in a palpably unreasonable manner by failing to protect against the depression on the shoulder. Id. at 78. It observed the county was "responsible for maintaining an extensive network of roads," and that, again, there were "no prior complaints or reports of injuries" on that particular stretch of road. Id. at 77. The Court noted the relatively small size of the declivity, and

22

found that even if the county had been on notice of its presence, it might reasonably have been viewed "as a maintenance item of low priority." Ibid.

Ultimately, the Polzo II Court concluded that even when viewing the evidence in the light most favorable to the plaintiff, a reasonable trier of fact could not conclude that the county was on constructive notice of any dangerous condition on the shoulder of its roadway or that its failure to fix the depression that caused the victim's fall was palpably unreasonable. Id. at 56. It therefore reinstated the trial court's grant of summary judgment. Id. at 78.

The Present Case Compared with Polzo

Plaintiffs in the present case argue that the many potholes and "trenches" on Wyckoff Mills Road created a dangerous condition and that Monroe and Cranbury had actual or constructive notice of that condition. They assert the "defect" in the road was "massive" and rendered it unsafe for cars and bicycles alike. They further argue that bicyclists were "expected in the area" because of the proximity of a local bike path marked by signage on Wyckoff Mills Road.

Plaintiffs stress that employees of the townships stated in their depositions their respective workers had repaired potholes at the accident location multiple times, which plaintiffs assert demonstrates knowledge that "the roadway was not safe for reasonably foreseeable users." Plaintiffs contend that the repairs the

townships conducted were negligent and palpably unreasonable because they "continually failed" to render the road safe. Hence, summary judgment in favor of the municipal defendants was not appropriate, and that instead, these issues should have been decided by a jury.

Although plaintiff in his deposition first described the potholes that caused his fall as "on the right shoulder of that lane," he clarified that the potholes were on the outer half of the lane, where the road contained no shoulder. Indeed, photos and other descriptions of the accident location indicate the paved surface next to the travel lane appears to be narrower than a full shoulder. In places, a shoulder appears to be completely non-existent. In addition, the potholes and irregular surfaces depicted in the exhibits appear to extend into the lanes of the road used by motor vehicles. Plaintiffs' expert described the road in his report as lacking "shoulders but with a white fog line on each side."

At the very least, there is a genuine issue of fact as to whether plaintiff's loss of balance occurred, at least in part, because of a dangerous condition of the surfaces in the driving lanes of the road, in contrast to any "shoulder." Because plaintiffs were the non-movants on the townships' summary judgment motion, they are entitled to all reasonable inferences of fact. Brill, 142 N.J. at 528. Hence, subject to causation questions we discuss infra, we assume in our

24

analysis, without deciding, that plaintiff's accident occurred because of potholes and irregularities on the motor vehicle lanes and not completely on any shoulder. If that assumption is proven to a jury to be true, this case is markedly distinguishable from the facts of Polzo involving a shoulder accident and the Supreme Court's analysis of that case.

The Court emphasized in Polzo II the legal importance of the fact that the bicycle accident there occurred on the road's shoulder—emphasizing the word in the following passage:

> Even looking at the evidence, as we must, in the light most favorable to plaintiff, we cannot conclude that the County was on either actual or constructive notice of a dangerous condition on the shoulder of Parsonage Hill Road.
>
> [209 N.J. at 70.]

Later in that same paragraph, the Court repeated the fact that the accident took place on the shoulder, which we underscore below:

> Thus, the question really boils down to whether the County—five weeks before the accident—should have discovered the two-foot wide depression on the shoulder of the road that reached a maximum depth of one-and-one-half inches and determined that it was a 'dangerous condition [that] created a reasonably foreseeable risk of' causing death. N.J.S.A. 59:4-2.
>
> [Ibid. (emphasis added).]

Within its legal analysis that followed, the Court then highlighted the distinction between a roadway and a shoulder, as affecting a public entity's potential liability for a dangerous condition:

> [W]e begin with some basic principles of law governing our roadways. The 'roadway' is 'that portion of a highway . . . ordinarily used for vehicular travel,' whereas the 'shoulder' is 'that portion of the highway, exclusive of and bordering the roadway, <u>designed for emergency use</u> but not ordinarily to be used for vehicular travel.' N.J.S.A. 39:1-1 (emphasis added); <u>see also</u> <u>Hochberger v. G.R. Wood, Inc.</u>, 124 N.J.L. 518, 520 (E. & A. 1940) ('The shoulder is not designed nor constructed for general traffic uses but is rather for emergency uses such as parking of vehicles disabled or otherwise.'); <u>Sharp v. Cresson</u>, 63 N.J. Super. 215, 221 (App. Div. 1960) ('It is clear that the Legislature did not intend that the shoulder of a road be used for ordinary travel.'). A 'vehicle' is defined as 'every device in, upon or by which a person or property is or may be transported upon a highway, <u>excepting devices moved by human power</u> or used exclusively upon stationary rails or tracks or motorized bicycles.' N.J.S.A. 39:1-1 (emphasis added).

> [<u>Id.</u> at 70-71.]

The Court then underscored this roadway/shoulder distinction as it relates to bicycle travel:

> By the Motor Vehicle Code's plain terms, roadways generally are built and maintained for cars, trucks, and motorcycles—not bicycles. Even the <u>Pothole Primer</u>— relied on by plaintiff—defines a pothole as a 'pavement defect' that will 'cause significant noticeable impact on

26

vehicle tires and vehicle handling.' Pothole Primer, supra, at 6 (emphasis added).

[Id. at 71.]

The Court added:

A bicycle rider on a roadway is vested with all the 'rights' and 'duties applicable to the driver of a vehicle' under Title 39, chapter four of our Motor Vehicle Code. N.J.S.A. 39:4-14.1. Under the Motor Vehicle Code, '[e]very person operating a bicycle upon a roadway [is required to] ride as near to the right side of the roadway as practicable.' N.J.S.A. 39:4-14.2. Bicyclists do not have special privileges on a roadway's shoulder. Indeed, a bicycle rider is directed to ride on the furthest right hand side of the roadway, not on the roadway's shoulder. The Motor Vehicle Code does not designate the roadway's shoulder as a bicycle lane.

[Ibid.]

In footnote 9 connected to this passage, the Court explained the public

entity's duties of care relating to designated bicycle lanes:

A public entity's designation of a portion of the roadway as a bicycle lane would alter the generally intended use of that part of the road and would require the public entity to maintain it in a reasonably safe manner for those purposes. See Atalese, supra, 365 N.J. Super. at 6 (holding that three-quarter inch depression on bicycle/pedestrian lane could be found by jury to be dangerous condition given path's intended uses).

[Id. at 71 n.9.]

Apart from such designated bicycle lanes, the Court acknowledged in Polzo II that bicyclists travel on roadways and, at times, their shoulders, but that public entities generally do not have a duty to keep their surfaces "completely risk-free for bicyclists":

> We understand that many bicyclists may be inclined to ride on a roadway's shoulder to stay clear of vehicular traffic and out of concern for their safety. Nevertheless, inherent dangers confront bicyclists who travel on roadways that are not faced by operators of motor vehicles. A tree branch, a stone, and even a pothole or depression might destabilize a bicycle that a car would harmlessly pass over.
>
> Public entities do not have the ability or resources to remove all dangers peculiar to bicycles. Roadways cannot possibly be made or maintained completely risk-free for bicyclists.
>
> [Ibid. (emphasis added).]

Based on this reasoning, the Court declared that "Roadways generally are intended for and used by operators of vehicles." Ibid. In support, the Court cited the Illinois Supreme Court's interpretation of its own state's tort immunity statute in Boub v. Township of Wayne, 702 N.E.2d 535 (1998), in which the Court "held that although bicycle riders are permissive users of roadways, those riders should not 'be considered intended users.'" Id. at 72.

Applying these principles to the facts in Polzo II, the Court concluded "[t]he evidence viewed in the light most favorable to [the] plaintiff reveals a failure of proof." Id. at 74. "The depression, located on the roadway's shoulder, was, at best, just one-and-one-half inches in depth, and the generally intended purpose of a roadway is for vehicular use and the generally intended purpose of the shoulder is for emergency use." Id. at 74-75 (emphasis added).

The record in the present case, viewed in a light most favorable to plaintiffs, is markedly different from Polzo. As we noted above, plaintiff's accident, consistent with his markings on the photographs at his deposition, occurred on the travel lanes of the road, not on a shoulder. Unlike Polzo, a public safety director here testified that maintenance crews had gone to this road "hundreds of times" in the five years preceding plaintiff's accident to repair potholes and depressions. Even if that estimate (which was not suggested by the wording of counsel's question) was possibly exaggerated, it bespeaks a chronic and persisting dangerous condition that required continuous maintenance. As we noted, both townships had received numerous complaints about the road's poor condition, albeit no reports of accidents.

Furthermore, plaintiff's engineering expert did not confine his opinion about the road's hazardous condition to bicyclists. He explicitly stated as follows:

> The roadway surface at [plaintiff's] accident location was a hazardous condition. The condition of that roadway was not appropriate for bicycle or even motorcycle traffic given the number of potholes, the number of failed repairs to potholes, the settlement of the trench pavement with respect to the roadway pavement and the crack that developed between the two surfaces. The Townships each had actual notice of this failed condition through their patrolling of the roadways, looking for dangerous and hazardous conditions and their hundreds of repairs to this roadway in the area where [plaintiff's] accident took place. Their failure to analyze the condition of this roadway, to make the proper repair of the roadway, to restore [it] to a reasonably safe condition for the vehicles expected on that roadway was palpably unreasonable and the cause of this accident.
>
> . . . .
>
> [The townships] failed to conclude that the repairs they were making were improper and only causing further deterioration to the roadway placing it in a condition hazardous to bicyclists and motorcyclists on this roadway.
>
> [(Emphasis added).]

This unrebutted expert opinion attests that the road surface was hazardous not only to bicycles, but also motorcycles. A motorcycle is defined as

30

"motorcycles, autocycles, motor bikes, bicycles with motor attached and all motor-operated vehicles of the bicycle or tricycle type," except electric scooters and low-speed electric bikes. N.J.S.A. 39:1-1.[5] As the Court noted in Polzo II, under "the Motor Vehicle Code's plain terms, roadways generally are built and maintained for cars, trucks, and motorcycles—not bicycles." Id. at 71 (emphasis added).

The trial court's oral decision on summary judgment did not address this important facet of plaintiffs' engineering expert's report. Defendants have not identified in their appellate submissions any counterevidence showing that the road was, in fact, safe for motorcyclists.

We discern no analytic reason why a road surface that is unsafe for motorcyclists, on which a bicyclist sustains an injury due to that same hazardous condition, cannot support potential liability of the public entity that maintains the roadway in a "palpably unreasonable" manner. There is nothing in Polzo I or Polzo II that contradicts that proposition. At the very least, the expert report provides ample grounds to raise genuine—and legally material—questions of fact concerning the condition of the roadway and the townships' corresponding

---

[5] We need not address here low-speed electric scooters. See Goyco v. Progressive Ins. Co., 257 N.J. 313, 316 (2024).

duties of care.[6]  We recognize, as in <u>Polzo II</u>, that the road surfaces do not have to be "completely risk-free" for two-wheeled vehicles, 209 N.J. at 71, but plaintiffs' expert and the associated regulations do not advance such an absolute duty.

We can take judicial notice that since <u>Polzo</u> was decided more than a decade ago, bicycling has become more prevalent across the nation and in our densely populated state.  Some of that increase is attributable to the COVID-19 pandemic and its aftermath.  A recent Rutgers University study reports that approximately 34% of over 2,400 surveyed New Jerseyans increased recreational bicycling during the pandemic.[7]  According to United States Census data, the proportion of New Jersey commuters who bicycle to work increased by 13% from 2019 to 2022.[8]  Such increased bicycling has amplified the risks of

---

[6]  We do not address here whether any objections or in limine motions might render the expert's opinions inadmissible, in full or in part, under the net opinion doctrine or other grounds.

[7]  Hannah Younes, et al., <u>Insight Hub: Working From Home Increases Cycling in New Jersey</u>, <u>ZAG Daily</u> (Nov. 17, 2023) https://www.zagdaily.com/opinion/insight-hub-working-from-home-increases-cycling-in-new-jersey.

[8]  The League of Am. Bicyclists, <u>Changes in Biking and Walking to Work</u>, https://data.bikeleague.org/data/states-rates-of-active-commuting/#3 (last visited June 20, 2024).

A-2005-21

accidents. From 2012 to 2021, the decade following <u>Polzo II</u>, bicyclist fatalities from crashes with motor vehicles increased nationally by 27.1% from 2012 to 2021.[9] Indeed, in 2022, approximately 1,105 bicyclists nationally died in crashes with motor vehicles, and 46,195 cyclists were injured.[10] Although the present case did not involve a direct collision between a bicyclist and a motor vehicle, the combined involvement of Barr's truck and the dangerous road surface is alleged to have produced plaintiff's severe injury.

Frequently, as here, bicyclists use public roadways also traveled by motor vehicles. In some instances, designated bicycle lanes have been created to separate bicycles from other traffic. However, in locations where no such lanes have been designated, the importance of safe roadways does not end. If the roadway is unsafe for both motor vehicles (such as motorcycles) and bicycles, the government's duty of care may extend fairly to both categories of plaintiffs.

Even though, as the Court noted in <u>Polzo I</u> and <u>Polzo II</u>, the state of Illinois has concluded that bicyclists are not intended users of roadways for purposes of its tort immunity statute, several other states have embraced more expansive

---

[9] Nat'l Ctr. for Stat. Analysis, <u>Bicyclists and Other Cyclists: 2021 Data</u> 2 (2023).

[10] Nat'l Ctr. for Stat. Analysis, Bicycle Safety, https://www.trafficsafetymarketing.gov/safety-topics/bicycle-safety (last visited June 20, 2024).

<span style="float:right">A-2005-21</span>

liability.[11]  Our Court in <u>Polzo</u> was not confronted with the present scenario of a bicycle accident occurring on the non-shoulder portion of a roadway that an engineering expert has found to be unsafe for both bicyclists and motorcyclists.

As we previewed in the introduction, DOT guidelines also address the need to maintain road surfaces in a safe manner for roadways on which "bicycles normally operate":

> The condition of the roadway surface is an important element in both bicycle safety and level of service.  In general, due to their high pressure, narrow profile tires, lack of suspension, and need to maintain balance, bicycles require a higher standard of road maintenance than motor vehicles.  Potholes, bumps, seams, and debris—which can be of minor annoyance or no consequence whatever to motor vehicles—are potential hazards to bicycle traffic as these obstacles can cause loss of control of the bicycle, or cause the bicyclist to risk conflict with motor vehicle traffic by swerving to avoid the obstacle.
>
> For the above-mentioned reason, <u>the roadway surface on which bicycles normally operate</u> should be maintained free of potholes, bumps, corrugations,

---

[11]  Benjamin J. Vernia, <u>State and Local Governmental Liability for Injury or Death of Bicyclist Due to Defect or Obstruction in Public Roadway or Sidewalk</u>, 12 A.L.R.6th 645 (2006).  <u>See also</u> <u>O'Neill v. City of Port Orchard</u>, 375 P.3d 709, 772 (Wash. Ct. App. 2016) (supporting potential liability of a public entity to a bicyclist); <u>Himmelstein v. Twp. of Windsor</u>, 39 A.3d 1065, 1067 (Conn. 2012) (same); <u>Caraballo v. City of Yonkers</u>, 54 A.D.3d 796, 796-97 (N.Y. App. Div. 2008) (same).  <u>But see</u> <u>Alave v. City of Chicago</u>, __ N.E.3d __, __ (Ill. 2023) (slip op. at 53) (rejecting such liability and reaffirming <u>Boub</u>, 702 N.E.2d at 535 (cited by <u>Polzo II</u>, 209 N.J. at 71-72)).

seams, unravelled pavement edges, gravel, glass fragments, and any other debris or obstacles that mar a smooth riding surface. <u>The area involved includes the right portion of the outside travel lane plus any additional space</u>. Typically, this portion of the roadway gets less attention as maintenance efforts are concentrated on the portion of the roadway used by motor vehicles.

Maintenance repairs in this area should be carried out with the needs of the bicycle in mind; i.e., they should be done in a workmanlike fashion <u>with particular attention to providing a smooth pavement surface</u>.

The following actions are recommended by the 1991 AASHTO Guide for the Development of Bicycle Facilities as requirements in the operation and maintenance of bicycle facilities.

- Create a smooth surface free of potholes and debris.
- Eliminate dropoffs from pavement edges.
- Inspect pavement conditions—do not allow unravelled pavement edges.

. . . .

Maintenance of roadways to accommodate bicycle traffic does not usually require changes in the types of maintenance activities that are carried out; rather it requires changes in the focus of maintenance practices. <u>Where possible, maintenance, repair and litter removal activities should be shifted to include not to ignore, roadway margins and shoulders</u>.

[N.J. Dep't of Transp., <u>Bicycle Compatible Roadways and Bikeways</u> 61 (1996) (emphases added).]

A-2005-21

These governmental standards, although evidential and not conclusive of tort liability,[12] spotlight the importance of addressing dangerous road surfaces used by bicycles and motorcycles, particularly on the aforementioned "right portion of the outside travel lane." Ibid. To be sure, motorcycles generally are heavier and more stable than bicycles, but it stands to reason that a surface condition hazardous to a motorcycle would often also be hazardous to a bicyclist.

The trial court erred in its analysis by apparently presuming that the townships had no duty to maintain the road surface in a condition that was not dangerous to both motorcycles and bicycles. We appreciate that a condition that might not be hazardous for a truck or an automobile might be unsafe for a two-wheeled vehicle such as a motorcycle. But the Court in Polzo II expressly included motorcycles within its analysis of the legal duties at stake. 209 N.J. at 71.

___

[12] See Model Jury Charges (Civil), 5.10I, "Evidence of and Per Se Negligence" (Apr. 2016) (explaining whether violation of an administrative regulation can support a finding of negligence); Hrymoc v. Ethicon, Inc., 254 N.J. 446, 472-75 (2023) (discussing the non-dispositive evidential value of FDA approval of a medical device in assessing the reasonableness of a manufacturer's conduct); Horbal v. McNeil, 66 N.J. 99, 103 (1974) (traffic regulations constitute standards of conduct, violation of which is non-dispositive evidence for jury's consideration in assessing reasonableness of driver's conduct).

We recognize the maintenance burden on public entities, but that burden is justified when liability is confined to limited situations where the non-shoulder portion of a road is proven to be dangerous to both motorcycles and bicycles, there is no designated bicycle lane, and the condition is so extreme and persisting that the failure to make it safe after repeated notice is palpably unreasonable. We further underscore that the plaintiff operating the two-wheeled vehicle must use due care when confronting a visibly hazardous potholed surface.

These road maintenance principles align with those the Court set forth in Polzo. The Court in Polzo did not confine the public entity's duties of care to only those bicyclists who are pedaling on designated bike lanes. As a practical matter, although bike lane designations are growing, bicyclists most often must "share the road" with motorized vehicles. And sometimes bicyclists must veer out of those designated lanes due to parked cars or other obstructions. If a known road surface condition is so treacherous that it poses a palpably unreasonable danger to motorcycles, then, as we noted above, it is most likely treacherous to bicyclists as well. Public entities bear no additional maintenance costs by addressing those mutually dangerous conditions, which they already

must repair or warn about under present case law. Consequently, our holding fairly can be and is effective immediately.

C.

Palpably Unreasonable?

We complete this analysis with a brief discussion of whether the summary judgment record presents a jury question of whether the townships' actions and inactions were "palpably unreasonable." The issue of palpable unreasonableness is typically one for the jury. Vincitore, 169 N.J. at 130. However, it may be decided by the court as a matter of law in "appropriate" cases. Polzo II, 209 N.J. at 75 n.12.

Viewing this record in a light most favorable to plaintiffs, and subject to additional testimony and evidence that may emerge at trial, the conduct of the township defendants could logically be deemed by a jury to have been palpably unreasonable. The chronically poor condition of the roadway, and the failure of hundreds of attempted repairs and patches to cure the defect, plus the numerous complaints received, are enough to present a triable issue. At trial, the townships are free to present evidence weighing against such a finding of extremity, such as the alleged unavailability of "hot patch" material. But it would be premature on this record to dismiss the TCA claims as a matter of law.

38

Due Care by Plaintiff?

We also reject the townships' argument that it is clear that plaintiff, a very experienced bicyclist, operated his bicycle in a dangerous manner by choosing to bicycle on this stretch of road at all, and in pedaling near the center of the road to avoid the potholes. These issues of plaintiff's conduct and due care likewise raise factual assessments suitable for trial, not summary judgment.

For these many reasons, we vacate the trial court's grant of summary judgment to the townships on the substantive TCA issues.

III.

**[At the court's direction, the published version of this opinion omits Part III pursuant to Rule 1:36-3.]**

IV.

For the reasons noted above in Part II, summary judgment in favor of the defendant townships is vacated, and the matter is remanded to the trial court for further proceedings. We affirm on all other issues. Jurisdiction is not retained.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION

A-2005-21